IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KRISTIN RODGERS,

*Plaintiff*,

v.

EAGLE ALLIANCE, *et al.*

*Defendants*.

Civil Action No. ELH-19-3268

**MEMORANDUM OPINION**

In a First Amended Complaint alleging employment discrimination (ECF 13), plaintiff Kristin Rodgers sued defendants COSMO, Inc. ("COSMO"); Eagle Alliance ("EA," "Eagle," or "Eagle Alliance"); CSRA, Inc. ("CSRA"); and General Dynamics Information Technology ("GDIT"). She alleges discrimination based on sex (Count 1) and retaliation (Count 2), in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*

Rodgers was hired by COSMO in August 2013 and was assigned to work as a subcontractor for Eagle Alliance. In turn, Eagle had a contract with the National Security Agency ("NSA") to provide technical support services, pursuant to a contract known as "Groundbreaker," on which plaintiff worked.

Plaintiff claims that she was "jointly employed by COSMO and EA/CSRA." ECF 13 at 4.[1] At the relevant time, EA was owned by CSRA, which was subsequently acquired by GDIT. *Id.* ¶¶ 17, 18, 40. I shall refer to CSRA, GDIT, and EA collectively as the "EA Defendants."

---

[1] The Court may take judicial notice of "'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *see* Fed. R. Evid. 201(b). Broadly speaking, this includes "factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007).

The events underlying plaintiff's suit are largely rooted in plaintiff's removal from the Groundbreaker contract in August 2016 and the failure of the EA Defendants to place plaintiff elsewhere.   Thereafter, on August 12, 2016, COSMO terminated plaintiff's employment.   In plaintiff's view, she was subjected to sex discrimination and retaliation by EA.   Thus, she filed two discrimination charges with the Equal Employment Opportunity Commission ("EEOC"), one alleging sex discrimination and the other alleging retaliation.   Both named "Eagle Alliance/CSRA, Inc." ECF 23-1; ECF 54-25.[2]   In October 2019, the EEOC issued written determinations as to each charge.   ECF 54-25 at 2-3, 4-5.   It found that there was reasonable cause to believe that EA's conduct amounted to sex discrimination and retaliation.   *Id.* at 2, 4.   This suit followed.

COSMO moved to dismiss the First Amended Complaint, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.   ECF 19.   By Memorandum Opinion (ECF 37) and Order (ECF 38) of April 3, 2020, I granted the motion, based on plaintiff's failure to exhaust her administrative remedies.   As noted in ECF 37, plaintiff's EEOC complaints did not implicate COSMO.   Accordingly, COSMO was dismissed from the suit.   Thereafter, the remaining parties engaged in discovery.

The EA Defendants have now moved for summary judgment (ECF 53), supported by a memorandum of law (ECF 53-1) (collectively, the "Motion") and many exhibits.   Plaintiff opposes

---

The parties did not describe the nature of COSMO's business.   But, according to its public website, COSMO "brings knowledgeable IT systems expertise, software development proficiency, innovative learning solutions for workforce development, and exceptional operations and production support to the enterprise, empowering Federal government stakeholders to fulfill their mission with confidence and efficiency."   *About Us*, COSMO, https://comso.com/about/#meet-the-team (last accessed Apr. 25, 2022).

[2] The Court was not provided with a copy of either charge.   But, with her opposition to COSMO's motion to dismiss, plaintiff submitted a copy of an "Intake Questionnaire," in which she alleged sex discrimination against "Eagle Alliance/CSRA Inc".   *See* ECF 23-1 at 1.

the Motion  (ECF 54) and also submitted "Plaintiff's Responses To Defendants' Statement of Uncontested Material Facts" (ECF 54-1) (collectively, the "Opposition), as well as numerous exhibits.  Defendants have replied.  ECF 55 (the "Reply").  They also submitted an additional exhibit.  *See* ECF 55-1.

No hearing is necessary.  *See* Local Rule 105.6.  For the reasons that follow, I shall grant the Motion in part and deny it in part.

## I.        Factual Background[3]

EA was formed in 2001 as a "partnership" between Computer Science Corporation ("CSC") and Northrop Grumman ("Northrop").  ECF 54-4 (Christopher Maudlen Dep.) at 3 (Tr. at 8).[4]  CSC "split its government division off in [November 2015] to become . . . CS Government Solutions," and simultaneously "merged with a company called SRA to form CSRA."  *Id.* at 5 (Tr. at 10); *see id.* at 8 (Tr. at 19) (clarifying that these transactions occurred in November 2015). Thereafter, in April 2018, "General Dynamics"[5] acquired and then "dissolved" CSRA, merging it

---

[3] The facts derive largely from the parties' exhibits, viewed in the light most favorable to plaintiff as the nonmoving party.  In the text of the Memorandum Opinion, I have attempted to define the exhibits at least once, and often several times.

Notably, both parties have submitted partial transcripts of the deposition testimony of various witnesses, including the testimony of COSMO's Rule 30(b)(6) corporate designee, Paul Sager (ECF 53-7 (defendants), ECF 54-3 (plaintiff)); Eagle Alliance's Rule 30(b)6) corporate designees, Theresa Bryant (ECF 53-6 (defendants), ECF 54-5 (plaintiff)), and Kelly Miller (ECF 53-11 (defendants), ECF 54-16 (plaintiff)); as well as Rodgers (ECF 53-5 (defendants), ECF 54-7 (plaintiff)).  In some instances, these exhibits include overlapping portions of testimony.

[4] Eagle Alliance's public website states, in part, that it is "an industry leader in Global Enterprise Digital Services Management within the Intelligence Community. [It] deliver[s] highly available, secure, modernized solutions that are vital to national security."  *Eagle Alliance*, GENERAL DYNAMICS INFORMATION TECHNOLOGY, https://www.gdit.com/eagle-alliance/ (last accessed Apr. 25, 2022).

[5] In context, Maudlen's reference to General Dynamics appears to refer to General Dynamics Corporation.

with one of its divisions, GDIT.   *Id.* at 4-6 (Tr. at 10-11); *see id.* at 8 (Tr. at 19).   Through this

acquisition, GDIT obtained CSRA's ownership interest in EA.   *Id.* at 4, 8 (Tr. at 9, 19).

On July 2, 2013, COSMO issued an offer letter to plaintiff.   ECF 53-3 ("Offer Letter");

ECF 54-6 at 2 (same).   Among other things, the Offer Letter indicated that COSMO would pay

Rodgers a bi-weekly salary.   ECF 53-3.   However, it also noted that plaintiff would remain in

"non-pay status, pending approval from COSMO's prime contractor of [her] experience and

qualifications; agency acceptance and approval of [her] clearances; and satisfactory completion of

[her] reference checks."   *Id.*   Further, the Offer Letter stated: "Once these conditions have been

met, [Rodgers] will transition from non-pay to pay status."   *Id.*   Rodgers accepted COSMO's offer

on the date of issuance.   *Id.*

The hire was effective on August 27, 2013, "for a help desk on a DOD[6] program."   ECF

54-3 (Paul Sager Dep.) at 3 (Tr. at 9).[7]   Plaintiff was deemed a "subcontractor," and Eagle was the

"prime contractor."   *Id.* at 4 (Tr. at 10), *id.* at 12 (Tr. at 20).   In particular, EA served as the prime

contractor on "a classified federal program aimed at providing Help Desk support to the National

Security Agency ('NSA') and modernizing the NSA's information technology infrastructure."

ECF 53-4 (Kelly Miller Decl.), ⁋3; *see* ECF 54-3 (Sager Dep.) at 4 (Tr. at 10); ECF 54-12 (Rodgers

Decl.), ⁋1.[8]   As mentioned, the contract was known as "Groundbreaker."   ECF 54-3 at 4 (Tr. at

10).

---

[6] Presumably, DOD is an abbreviation for Department of Defense.

[7] Both parties submitted a copy of the Offer Letter, which reflects that COSMO offered
Rodgers a position of employment on July 2, 2013, and plaintiff accepted the offer on that date.
*See* ECF 53-3 (Offer Letter); ECF 54-6 (same).   Nonetheless, the parties agree that plaintiff was
hired by COSMO on August 27, 2013.   *See* ECF 53-1 at 4, ⁋1; ECF 54 at 4, ⁋1.

[8] The parties' exhibits occasionally refer to Kelly Miller as Kelly Taylor or Kelly Taylor
Miller.   *See, e.g.*, ECF 53-5 (Rodgers Dep.) at 13 (Tr. at 106).   Between 2007 and 2016, she used

Due to the classified nature of the Groundbreaker contract, Eagle employees as well as the subcontractors assigned to the contract "were required to possess various levels of security clearances."  ECF 53-4 (Miller Decl.), ⁋ 4.  And, "the Government was notified of and had to approve any Eagle Alliance employee or subcontract worker's onboarding onto the contract."  *Id.* ⁋ 5.  Similarly, "[t]he Government also had to be immediately notified of any worker's removal from the contract."  *Id.*

At the time, Paul Sager served as a "Program Manager" for COSMO.  *See* ECF 53-14 (Letter from Sager to Rodgers, reflecting Sager's title).[9]  Sager testified concerning the nature of the relationship between COSMO's employees and EA.  He indicated that when EA determined that a COSMO employee was suitable for work on an EA contract, an EA official would send an email to Sager indicating the firm's formal acceptance of the employee for a particular position. ECF 54-3 at 4 (Tr. at 10).  Sager also noted that on occasion EA rejected candidates who were selected by COSMO.  *Id.* at 12-13 (Tr. at 20-21).

Theresa "Terri" Bryant was employed by Eagle in August 2016 as the "Subcontractor Hiring Specialist."  ECF 53-9 (Bryant Decl.), ⁋⁋ 1, 2.[10]  Her duties included the handling of requests for hiring or terminating subcontractors working on Groundbreaker.  *Id.* ⁋ 3; *see* ECF 53-6 (Bryant Dep.) at 6 (Tr. at 5); *see also* ECF 53-6 at 19-29 (Tr. at 101-11).

---

the name Kelly Marie Taylor.  ECF 53-11 (Miller Dep.) at 4 (Tr. at 15).  For consistency, I shall refer to her as Miller.

[9] According to COSMO's website, Sager now possesses the job title "Director, NSA Portfolio."  *See About Us*, COMSO, https://comso.com/about/#meet-the-team (last accessed Apr. 25, 2022).

[10] On occasion, the exhibits erroneously use the spelling of "Terry," rather than "Terri." *See*, *e.g.*, ECF 53-11 (Miller Dep.) at 7 (Tr. at 21); ECF 54-3 (Sager Dep.) at 19 (Tr. at 27).

According to Bryant, EA employees lacked authority "to hire, fire, or discipline any subcontract workers." ECF 53-9, ⁋ 4.  All discipline, "including removal from Eagle Alliance and termination from the direct employer—was handled by the subcontract worker's direct employer." *Id.* ⁋ 5.  In contrast, Bryant also noted: "If an Eagle Alliance manager requested discipline, counseling, or removal of a subcontractor, they would explain the situation and request to me." *Id.* ⁋ 6.  In turn, Bryant would "then explain the request to the direct employer, who ultimately determined whether to implement the requested discipline." *Id.* ⁋ 7.

In addition, Bryant averred that EA "did not maintain any personnel, employment, insurance, benefits, payroll, or other similar records for any subcontractors." *Id.* ⁋ 8.  However, Rodgers posits that "EA maintained documents on its subcontractors including security clearance paperwork." ECF 54-12 (Rodgers Decl.), ⁋ 5.

Sager testified that if EA wanted to "remove a COSMO employee from the subcontract," COSMO would "receive a notice, typically, from either [EA's] security office or the staffing department directing [COSMO] to remove an employee." ECF 54-3 (Sager Dep.) at 5 (Tr. at 11).  Upon receipt of such a notification, Sager called "the person who notified or the staffing manager looking for an explanation for the removal." *Id.* at 6 (Tr. at 12).  Further, if the notification was not "provided in writing[,] [Sager] would follow up . . ., especially if it was news to [him]." *Id.*

Notably, Sager indicated that if he did not hear of a complaint with respect to an employee before receiving a removal notification, his view was that "the decision should not be to remove the person from the program." *Id.* at 20 (Tr. at 28).  However, where a removal was effectuated, COSMO was obligated to ask the removed employee to "come down to [COSMO's] office or meet them offsite to give them the news that they've been removed . . . ." *Id.* at 5 (Tr. at 11).

Prior to being hired, Rodgers was interviewed in person by two EA managers, Matt Morgan and Michael Kenny. ECF 54-7 (Rodgers Dep.) at 3, 4 (Tr. at 86, 90). According to plaintiff, Morgan and Kenny "relayed . . . back to COSMO" that they "like[d] [plaintiff]" and that she was "qualified." *Id.* at 3 (Tr. at 86). Thereafter, Rodgers was placed at EA and assigned the role of Tier-One Help Desk Technician for the Groundbreaker contract. *See* ECF 53-6 (Bryant Dep.) at 7 (Tr. at 8); ECF 54-3 (Sager Dep.) at 6 (Tr. at 12); ECF 54-12 (Rodgers Decl.), ⁋ 1; ECF 53-1 at 4, ⁋ 2. Rodgers received training from an EA employee on the Help Desk's operations and her role within it. ECF 54-5 (Bryant Dep.) at 5-6 (Tr. at 10-11); ECF 54-3 (Sager Dep.) at 9 (Tr. at 15). Notably, COSMO did not provide the training. ECF 54-5 at 6 (Tr. at 11); ECF 54-3 at 9 (Tr. at 15).

As a Help Desk Technician, Rodgers was responsible for fielding and resolving customer issues such as "their computer usage [and] their access." ECF 54-3 at 7 (Tr. at 13). In particular, when a client called or emailed the Help Desk with an issue, a "trouble ticket" describing the problem would be "assigned to a technician on that desk for resolution." ECF 54-3 at 7-8 (Tr. at 13-14). Depending on the complexity of the problem, a Tier-One Help Desk Technician would either resolve the issue or, where necessary, refer the matter to a Tier-Two Technician. *See* ECF 53-6 (Bryant Dep.) at 11-12 (Tr. at 16-17).

Rodgers worked on a team that was supervised by two EA employees. *See* ECF 54-5 at 7-8 (Tr. at 12-13); *see also* ECF 54-3 at 8 (Tr. at 14). According to Sager, Rodgers was supervised by "a team leader" as well as another manager who worked directly above the team lead. ECF 54-3 at 8 (Tr. at 14).[11] Sager testified that the "team leader" need not be an EA employee. *See id.*

---

[11] The evidence reflects the terminology of the "team lead" as well as the "team leader." *See*, *e.g.*, ECF 54-3 at 8 (Tr. at 14). I shall use both terms.

But, at all relevant times, plaintiff's team leader was an employee of Eagle Alliance. *See* ECF 53-6 (Bryant Dep.) at 8-9 (Tr. at 12-13).

Beginning in April 2016, Omar Juarez assumed the role of Rodgers's team leader, and Jerome Lopez became Juarez's supervisor. ECF 53-6 (Bryant Dep.) at 8-9 (Tr. at 12-13). In turn, Lopez reported to Kelly Miller. *Id.* at 8 (Tr. at 12). Miller was employed by EA as the "SDG/Enterprise IT Service Center Manager." ECF 53-4 (Miller Decl.), ¶ 6. Juarez and Lopez were also EA employees. ECF 53-6 at 9 (Tr. at 13). Juarez was "employed by Eagle Alliance as the Enterprise Service Desk Afterhours Team Lead." ECF 53-10 (Juarez Decl.), ¶ 2. The parties did not identify Lopez's job title, but indicate that he was employed by Eagle to work as a manager, and he oversaw the mid- and night-shifts on the Help Desk, including Juarez's team. ECF 53-4 (Miller Decl.), ¶¶ 7-8; *see* ECF 53-7 (Sager Dep.) at 11 (Tr. at 59); ECF 53-6 (Bryant Dep.) at 8 (Tr. at 12) (same).

As discussed, *infra*, Lopez and Juarez played critical roles in the events leading up to plaintiff's removal from Groundbreaker. In particular, Juarez's observations of plaintiff's allegedly deficient performance, and Lopez's agreement with those observations, formed the basis of the EA Defendants' justification for plaintiff's removal from Groundbreaker. Curiously, no party has presented the Court with deposition testimony from either Juarez or Lopez. Instead, the defense only presented Juarez's Declaration. *See* ECF 53-10. Moreover, aside from a single email that Lopez sent to Miller (ECF 53-13 at 2-4), the parties have not offered any direct evidence from Lopez establishing his reason for seeking Rodgers's removal.

8

Initially, Rodgers was assigned to work the "midnight shift," from 1:00 a.m. to 9:00 a.m, per her request.  ECF 53-6 (Bryant Dep.) at 7 (Tr. at 8); ECF 54-3 at 7 (Tr. at 13).[12]  In an email from Rodgers to COSMO on June 17, 2013, Rodgers advised that she was "only in search of a 3rd shift/overnight position."  ECF 53-8; *see* ECF 53-7 (Sager Dep.) at 9 (Tr. at 57) (indicating that Sager was under the impression that Rodgers "was only interested in overnight positions because she was going to school during the day").

According to Rodgers, EA changed her shift on two occasions.  ECF 54-7 at 6-8 (Tr. at 97-99).  First, at some unspecified time in late 2015, Chris Michaels, an EA employee who managed Rodgers's team prior to Juarez, instructed Rodgers that her shift needed to start an hour earlier, *i.e.*, 12:00 a.m. to 8:00 a.m.  *Id.* at 6 (Tr. at 97); *see* ECF 54-5 (Bryant Dep.) at 8 (Tr. at 13) (describing Michaels as Juarez's predecessor).  Soon thereafter, Michaels asked plaintiff to work from 11:00 p.m. to 7:00 a.m., apparently so that her shift would align with "'the rest of the overnight people' . . . ."  ECF 54-7 at 7 (Tr. at 98).[13]  This was a two-hour change from the initial assignment.  Notably, Rodgers testified that when she later mentioned to Sager that the time of her shift had been changed, he indicated that he had not been informed of the change.  *Id.*  Nor was anyone else at COSMO aware of the change.  *Id.* at 8 (Tr. at 99).

Plaintiff was originally assigned to work at EA's facility in Annapolis Junction, Maryland.  ECF 54-3 (Sager Dep.) at 7 (Tr. at 13); ECF 54-5 (Bryant Dep.) at 4 (Tr. at 8).[14]  However, in

---

[12] At times, the parties refer to this shift as the "mid-shift."  *See*, *e.g.*,  ECF 53-4 (Miller Decl.), ¶ 13.

[13] Rodgers could not recall the dates on which her shifts were changed, indicating only that the first change occurred in "late 2015" and that the second happened in "2015 sometime."  ECF 54-7 at 6-7 (Tr. at 97-98).

[14] The EA facility was located at 2711 Technology Drive in Annapolis Junction, Maryland.  ECF 54-3 at 8 (Tr. at 14).  At various points throughout the deposition testimony of the witnesses,

April and May 2016, plaintiff was assigned by EA to a facility operated by the NSA. *See* ECF 54-3 at 7 (Tr. at 13); ECF 54-7 (Rodgers Dep.) at 17-19, 21 (Tr. 124-25, 127, 129). According to Rodgers, around this time, EA won a new contract with the NSA called "GEC". ECF 54-7 at 17-18 (Tr. at 124-25); *see* ECF 53-4 (Miller Decl.), ₱₱ 10-11 (describing the new contract). And, she claims that Eagle Alliance wanted its employees and subcontractors "to go over [to the NSA facility] and show a presence," because it "didn't want the government people feeling concerned." ECF 54-7 (Rodgers Dep.) at 18 (Tr. at 125).[15] To that end, Rodgers "was selected to go over . . . full time." *Id.* at 18 (Tr. at 125). Rodgers avers that COSMO officials were not informed of the change in location of her work site. *See id.* (stating that "no one told my company about" the decision to change her work location).

Rodgers recalled that she was supposed to work at the NSA facility until August 2016. ECF 54-7 at 19 (Tr. at 127). But, as discussed, *infra*, she was allowed to return to the EA facility at the end of May 2016. *Id.*

Rodgers received equipment, including a computer and a telephone, from Eagle Alliance. ECF 54-5 (Bryant Dep.) at 5 (Tr. at 10). But, Rodgers testified that she had persistent issues with her equipment. ECF 54-7 (Rodgers Dep.) at 22 (Tr. at 136). In particular, plaintiff claimed that her "monitor went bad, because it was constantly having problems with the display." *Id.* As a result, she frequently had to restart her computer, a process that could take as long as ten or fifteen minutes. *Id.*

---

the facility is referred to as "2711." *See*, *e.g.*, ECF 54-5 at 4 (Tr. at 8); ECF 54-7 at 18, 22 (Tr. at 125, 136).

[15] Rodgers refers to the NSA as the "Maryland agency." ECF 54-7 at 17 (Tr. at 124).

In July and August 2016, Rodgers reported her workstation issues to EA. *See* ECF 54-13 (log of tickets submitted by Rodgers). She submitted a ticket on July 22, 2016, which stated: "Workstation freezes and black screen appears on both monitors like it's stuck on sleep mode." *Id.* at 2. A ticket submitted on July 29, 2016, highlighted that Rodgers was experiencing a "TPAM problem." *Id.* And, on August 4, 2016, Rodgers experienced another "TPAM problem" and added: "New password and still can't access GSD Servers only." *Id.* All three tickets were closed on August 5, 2016. *Id.*

During plaintiff's tenure with Eagle, she received two salary increases from COSMO. ECF 54-3 (Sager Dep.) at 13-14 (Tr. at 21-22); ECF 54-11 (Salary Recommendation Forms). Specifically, Rodgers was approved for raises on August 28, 2014, and August 28, 2015, each in the amount of three percent of her annual salary. *See* ECF 54-11. Sager testified that Rodgers received these increases because she was an employee "in good stead." ECF 54-3 at 15 (Tr. at 23).

Sager testified that COSMO did not receive any communications from EA officials with respect to Rodgers's performance prior to the award of the raises. *Id.* Although Sager reached out to Rodgers's Eagle Alliance manager to discuss Rodgers's salary increase, "there was no response." ECF 53-7 (Sager Dep.) at 6 (Tr. at 17). Notably, COSMO was unaware of any issues with Rodgers's performance at EA until August 2016. *See* ECF 54-3 (Sager Dep.) at 15-16 (Tr. at 23-24).

Rodgers contends that Sager told her that "he works with EA management to decide if the employee is worthy of a performance increase." ECF 54-7 (Rodgers Dep.) at 25 (Tr. at 155). She recalled that "there was one time when [Sager] was trying to get in contact with one of the [EA] managers to do [a] performance review" for Rodgers, because he said he could not proceed without

EA's input.  *Id.*  An EA manager eventually responded to Sager's request, and thereafter Sager awarded a raise to Rodgers.  *Id.*

As mentioned, plaintiff's team leader, Juarez, reported to Lopez.  *See* ECF 53-10 (Juarez Decl.), ⁋ 22.  According to plaintiff, Lopez had a history of discriminatory conduct towards women.  In support of the claim, she submitted the Declaration of Stephen Adams.  Before Lopez joined Eagle, Adams had worked under Lopez's supervision at a firm in Texas called CACI International, Inc. ("CACI").  *See* ECF 54-17, ⁋ 1.  At CACI, Adams claims to have "personally witnessed Mr. Lopez's disrespectful and derogatory treatment towards women."  *Id.* ⁋ 5.[16]

In addition, Rodgers recounted an encounter that she had with Lopez in December 2015. She recalled  that before Lopez became her manager, he was a "lead on the day shift," and worked under another EA official, Matthew Morgan.  ECF 53-5 (Rodgers Dep.) at 11 (Tr. at 104).  At that time, Rodgers did not personally know Lopez.  *Id.* at 8 (Tr. at 101).  Nevertheless, on some unspecified date in December 2015, Lopez initiated a conversation with plaintiff while she was at her desk.  *Id.*

Among other things, Lopez questioned Rodgers about Michaels, who was Rodgers's manager at the time.  *Id.* at 9 (Tr. at 102).  Lopez pressed Rodgers about her relationship with Michaels as well as Michaels's management style.  *Id.*  When Rodgers indicated that she was happy with Michaels's performance as a manager,  Lopez became "visibly annoyed."  *Id.*  Lopez persisted in his questions to Rodgers at an increasingly high volume, which attracted the attention of Rodgers's coworkers.  *Id.*  Rodgers was so uncomfortable with Lopez's conduct that she left

---

[16] Defendants assert that the Declaration of Adams is not relevant.  ECF 55 at 12-13.  They also maintain that it contains hearsay.  *Id.* at 12 n.33.  In my view, Lopez's alleged conduct while employed at CACI has no relevance to his conduct in this case.  Therefore, I have made only a cursory reference to the Declaration.

the EA facility, even though she had planned to remain after her shift to work overtime. *Id.* at 10-11 (Tr. at 103-04). By the time Rodgers returned to work, Michaels had learned of Rodgers's encounter with Lopez. *Id.* at 11 (Tr. at 104). He told plaintiff that Lopez "'has a problem,'" and had been "'talking to the team about' [Michaels], . . ., 'particularly women.'" *Id.* at 12 (Tr. at 105).

Thereafter, Michaels lodged a complaint with Miller about Lopez, pertaining to the way Lopez behaved towards women. *Id.* at 13 (Tr. at 106). According to Rodgers, Miller subsequently told Lopez's manager to "'tell [Lopez] to stay away from [Rodgers].'" *Id.* Rodgers claims that, at the time, she was unaware that Michaels had filed this complaint. *Id.* at 14 (Tr. at 107). However, Miller denied that she had ever been made aware of any complaints about Lopez's behavior towards men or women. ECF 53-11 (Miller Dep.) at 21-22 (Tr. at 57-58).

In mid to early 2016, Eagle Alliance won a bid for a new contract. ECF 53-4 (Miller Decl.), ⁋⁋ 10, 11. As a result, the scope of work that Eagle was performing was dramatically expanded. Miller stated, *id.* ⁋ 11:

> Specifically, Eagle Alliance won the Global Service Desk. Prior to winning the Global Service desk, the Help Desk only serviced customers within a 50-mile radius of Fort Meade, Maryland, and only within the Eastern time zone. The new work meant significantly increased call volumes and traffic during the mid and night shifts, particularly since those shifts began servicing areas outside of the Eastern time zone.

By this time, Juarez and Lopez had assumed their supervisory roles over the Help Desk. *See* ECF 53-10 (Juarez Decl.), ⁋ 2 (stating that in April 2016 he was the "Enterprise Service Desk Afterhours Team Lead"), *id.* ⁋ 6; *see also* ECF 53-6 (Bryant Dep.) at 9-10 (Tr. at 13-14) (describing that Lopez became plaintiff's EA manager in April 2016). Given the expanded scope of work, EA sought to improve the Help Desk's performance. *See* ECF 53-11 (Miller Dep.) at 10 (Tr. at 29); ECF 53-4 (Miller Decl.), ⁋⁋ 11, 12. As a part of this effort, Juarez implemented a report card system, which was designed to track each Help Desk Technician's performance metrics, such as

tardiness, call outs, and number of tasks completed.  *See* ECF 53-10 (Juarez Decl.) ⸗ 9, 10; ECF 53-12 (copies of report cards).

Miller credited both Lopez and Juarez with the report card system, which she said was intended "to increase productivity and punctuality on the mid and night shifts."  ECF 53-4, ⸗ 13. She averred that both shifts of the Help Desk had "experienced significant performance and productivity issues" (*id.* ⸗ 9) before Lopez and Juarez assumed responsibility for the Help Desk. *Id.*  And, productivity "became even more important," *id.* ⸗ 12, after EA "won the Global Service Desk."  *Id.* ⸗ 11.

In particular, the report cards tracked punctuality, "not ready time," total number of transactions completed per shift, and other data pertinent to Help Desk "objectives."  ECF 53-10 (Juarez Decl.), ⸗ 10.  "Not ready time" pertained to "the amount of time a technician is 'unavailable' from the phone system and is unable to take incoming phone calls."  *Id.* ⸗ 11.  "[A]s a general department guideline, the expectation was each technician's not ready percentage to be 12.5% or less per week."  *Id.* ⸗ 13 [sic].  In addition, Juarez "expected all technicians to complete a minimum of 10 tasks per shift," and each Technician was to "arrive at his or her scheduled time, and to work the entirety of his or her shift."  *Id.* ⸗ 16, 17.  The report cards also tracked how many times a worker arrived late or left early from his or her shift.  *See generally* ECF 53-12.

According to Bryant, Juarez "entered the information"  for each person into a computer program, which would provide him with each employee's average performance statistics for the month.  ECF 54-5 at 12 (Tr. at 69); *see id.* at 13 (Tr. at 73).  Bryant testified that Juarez marked a person late if the worker arrived to his or her shift "within an hour of when they were supposed to report."  *Id.* at 12 (Tr. at 69). But, the report did not distinguish between those who were one minute late and one hour late.  *Id.*

14

Notably, Juarez claimed that he "explained each of [the] expectations to all Help Desk Technicians."   ECF 53-10, ⁋ 18.   And, he claimed that he "did not implement the report card system until June 2016 in order to give everyone an opportunity to improve their performance." *Id.* ⁋ 19.   However, Rodgers avers:  "Mr. Juarez never told me that there was a 12.5% maximum not ready time and this was not covered in my training."   ECF 54-12 (Rodgers Decl.), ⁋ 12. Moreover, it is undisputed that in April and May of 2016, plaintiff was not physically located at the EA facility.  *See* ECF 54-7 (Rodgers Dep.) at 19 (Tr. at 127).   She returned to the EA facility at the end of May 2016, and the new report card system was operationalized in June 2016.  *See* ECF 53-10 (Juarez Decl.), ⁋ 19.

According to Juarez, between April 2016, when he assumed a supervisory role for EA, until July 2016, he "noticed that three subcontractors consistently underperformed when compared to their colleagues."  *Id.* ⁋ 20.   They were Drapier Johnson, Al-Wayne Morgan, and plaintiff.  *Id.* ⁋ 21; *see* ECF 53-12 (copies of report cards for Rodgers, Johnson, and Morgan).   However, in his Declaration, Juarez does not explain how he determined that plaintiff's performance was deficient in April and May of 2016, given that she worked off site at that time, and the report cards were not yet in use.

As noted, the report cards went into effect in June 2016.  With respect to Rodgers's report card for the month of June 2016, plaintiff was late 14 times, called out once, and left early on one occasion.  ECF 53-12 at 3 (Rodgers June 2016 report card).  Further, Rodgers had an average "not ready" time of 12.57%.  *Id.*  Moreover, during the week of June 20, 2016, Rodgers's "not ready" time rose to 21.43%.  *Id.*  Further, Rodgers completed only 146 out of the 200 minimally required tasks expected of her across the month of June 2016, which equated to 73%.  *Id.*

Plaintiff's July 2016 report card revealed similar issues.  She was late on three occasions and called out twice.  *Id.* at 6.[17]  Further, her "not ready" time remained above the 12.5% threshold. *Id.*  And, she completed only 105 of the 170 of the minimum number of expected tasks for the month, which amounts to 62%.  *Id.*

By comparison, Morgan's June 2016 report card revealed eleven attendance issues, and indicated that Morgan completed only 43% of his minimum expected tasks for the month.  *Id.* at 2.  And, in July 2016, Morgan was late to his shift on nine occasions and completed only 33% of his required tasks.  *Id.* at 5.  Johnson had six attendance issues in June 2016, including one call out, and completed only 32% of his required tasks.  *Id.* at 1.  Moreover, in July 2016, Johnson completed 57 of his required 150 tasks.  *Id.* at 4.  However, both Johnson and Morgan maintained their "not ready" scores below the 12.5% threshold throughout June and July 2016.  *See id.* at 1-2, 4-5.

As mentioned, Rodgers had been assigned to work at an NSA facility in April and May of 2016.  *See* ECF 54-3 (Sager Dep.) at 7 (Tr. at 13); ECF 54-7 (Rodgers Dep.) at 17-19, 21 (Tr. at 124-25, 127, 129).  While at the NSA site, Rodgers felt isolated from "the rest of the team," who were located at the EA facility in Annapolis Junction.  ECF 54-7 at 19 (Tr. at 127).  She observed that the other workers "were able to be met with, have team meetings, group discussions . . . .  We were kind of forgotten about at [the NSA facility]."  *Id.*  Although Rodgers indicated that she "kept requesting to meet with [Juarez], because [she] was hearing that he [and Lopez] . . . were meeting with the team," she claimed that "no one had met with [her]."  *Id.*; *see also id.* at 26-27 (Tr. at 156-57).

---

[17]  Although plaintiff's June report card broke down her statistics by week, the July report card only provided plaintiff's monthly averages.  *Compare* ECF 53-12 at 3 *with id.* at 6.

Nonetheless, Juarez failed to meet with Rodgers until in or around July 2016, after Rodgers had returned to the EA facility. ECF 54-12 (Rodgers Decl.), ⁋ 8; *see* ECF 54-7 at 27 (Tr. at 157). She recounts that Juarez said: "'I'm noticing you have some attendance issues on the team, so I've been talking to the whole team collectively about it. I've been meeting with individuals about it.'" ECF 54-7 (Rodgers Dep.) at 28 (Tr. at 159). Further, Juarez asked plaintiff if she knew why Johnson or Morgan consistently came hours late to their shifts. *Id.* Plaintiff considered it "strange" for Juarez to discuss other employees with her. *Id.* She told him: "'I just know about myself.'" *Id.* at 28-29 (Tr. at 159-60).

Rodgers testified that she then asked Juarez: "'[I]s there anything that you think I can improve on myself? Anything I can do better, my tickets and everything?'" *Id.* at 29 (Tr. at 160). Juarez responded: "'No. Your tickets and all of that is fine.'" *Id.* However, he added: "'But I did notice that you've been coming in like one minute late.'" *Id.* Rodgers inquired: "'What do you mean one minute late?'" *Id.* He answered, "'11:01'". *Id.* In response, plaintiff said: "'Well, you know, to my knowledge I'm coming in on time[.]'" *Id.* But, Juarez claimed: "'If you show up right on time you are late.'" *Id.* Further, he stated that he expected Rodgers to be at work "'15, 20 minutes before [her] shift so there is no problems [sic] . . . .'" *Id.*

In response, Rodgers informed Juarez that her previous managers had allowed for a fifteen- to twenty-minute grace period. *Id.* at 30 (Tr. at 161). Further, plaintiff explained that she knew that EA had "badge swipes from the security office" that showed her arrival. *Id.* at 29 (Tr. at 160). And, she claimed that Juarez could not tell her the "specific times" that she supposedly was late. *Id.* at 30 (Tr. at 161).

Of significance, plaintiff claims that this was Juarez's only issue with her performance. According to Rodgers, Juarez said: "'Other than that, that's the only thing I got to say about you.

You're doing fine.'" *Id.* at 33 (Tr. at 164).  But, Juarez told Rodgers that "he had to meet" with Morgan and Johnson with respect to their "tickets." *Id.*

Based on the results reflected on the report cards of Rodgers, Morgan, and Johnson, Juarez spoke with his supervisor, Lopez, to request the removal of all three individuals.  ECF 53-10 (Juarez Decl.), ¶¶ 22, 23.  Lopez "agreed that the three subcontractors should be removed and he escalated the request to Kelly Miller." *Id.* ¶ 24.  Specifically, Lopez sent an email to Miller on August 1, 2016, in which he asked to replace a total of five "techs." *See* ECF 53-13 (August 1, 2016 email reflecting Lopez's request to Miller) at 1.  He stated that all had "been giving [sic] plenty of opportunities for improvement, but just don't have what it takes to fit the culture and work ethic of the Enterprise IT Service Center." *Id.*

With respect to Rodgers, Lopez recounted the results of her report cards from June and July 2016.  *Id.* at 2.  Further, he wrote, in relevant part, *id.*:

> Based on my observations, [plaintiff] lacks the motivation to keep up . . . .  There have been many instances where she runs into an issue and instead of bringing it up, waits until it becomes an issue, then when she is confronted regarding an issue, she will state she did not know.  [Rodgers] has been offered many times for additional training . . ., and does not take advantage of those trainings to make her more proficient.  [Rodgers] requires close supervision and cannot be trusted with completing important tasks without follow-up.  I have been observing this type of behavior since April and concluding [that Rodgers] does not have motivation to be proficient in this career . . . .  I am recommending [Rodgers] be replaced as her productivity and general attitude prove this primary employment is not important.  Generally, she does not respond back to emails from management and has proven that she does not read emails explaining specific processes being implemented.

In light of Lopez's recommendation, Miller decided to remove Rodgers, Morgan, and Johnson from the Groundbreaker contract.  ECF 53-13 at 1 (response from Miller to Lopez, indicating that she would "see what [she] can get moving on the subs and keep [Lopez] posted").  According to Miller, any differences in the subcontractors' performance, as reflected in their report

cards, were of no moment; to her, they "were all the same." ECF 54-16 (Miller Dep.) at 3 (Tr. at 35).

Further, in Lopez's email of August 1, 2016, Lopez requested the removal of Carl Bonds, an EA employee, and Charles Belew, a subcontractor who was formally employed by CACI. *See* ECF 53-13 at 3 (enumerating the reasons for the removal of Belew, a subcontractor, and Bonds, an EA employee); ECF 53-6 (Bryant Dep.) at 15 (Tr. at 88) (describing Belew as a CACI subcontractor). Lopez indicated that Juarez and an individual named Shane kept "report cards on all . . . techs." ECF 53-13 at 3. But, the Court has not been provided with copies of the report cards for Belew or Bonds.

Belew and Bonds are discussed, *infra*. But, as an EA employee, Bonds faced a different removal process than Rodgers. ECF 53-11 (Miller Dep.) at 5-7 (Tr.at 19-21). And, according to Bryant, "Belew's employer did not request counseling, and [thus] he was also removed from the contract." ECF 53-1 at 15 n.100 (citing ECF 53-6 (Bryant Dep.) at 15-17 (Tr. at 88-90)).

Miller testified that, as a general matter, when she decides that a subcontractor's removal is warranted, she would "go to Terry Bryant to . . . request removal," and "she would handle it from there and talk to the company." ECF 53-11 (Miller Dep.) at 7 (Tr. at 21). Thus, upon deciding to grant Lopez's request, Miller sent Bryant an email to facilitate the removal of Johnson, Morgan, and Rodgers. *Id.* at 7-8 (Tr. at 21-22).[18]

Thereafter, Bryant contacted each subcontractor's direct employer to provide notice of Eagle Alliance's request for removal from the Groundbreaker contract. *See* ECF 53-6 (Bryant Dep.) at 19-25 (Tr. at 101-07). According to defendants, Bryant spoke with the direct employers

---

[18] The parties have not submitted a copy of this email. Nor have they otherwise presented evidence establishing the date on which Miller contacted Bryant.

of Morgan, Johnson, and Rodgers on August 4, 2016.  ECF 53-1 at 15.  But, Bryant's testimony establishes only that she spoke with Rodgers's direct employer on that date.  ECF 53-6 at 25 (Tr. at 107).

According to Bryant, the employers of Morgan and Johnson immediately requested that their respective employees be given the opportunity to participate in counseling.  ECF 53-6 (Bryant Dep.) at 19-20, 23-24 (Tr. 101-02, 105-06).  And, Bryant testified that whenever a subcontractor's employer requests counseling during the course of a removal meeting, she has "to stop the meeting [and] go back to the manager" to determine if the subcontractor should be terminated or counseled. *Id.* at 19-20 (Tr. at 101-02).

Based on the requests for Morgan and Johnson, Bryant called Miller and asked whether Morgan and Johnson could be counseled, rather than removed.  *Id.* at 21, 23-24 (Tr. at 103 105-06).  Miller acquiesced to the counseling requests for them.  *Id.*; *see* ECF 53-11 (Miller Dep.) at 8 (Tr. at 22) ("I remember [Bryant] calling me and telling me that two of the companies were requesting a counsel.  They were pushing back . . . pleading their case to not remove and give a probationary period, and I agreed.").  As a result, Morgan and Johnson were counseled for a two-week period, and thereafter resumed their positions on the Groundbreaker contract, conditioned on their improved performance.  ECF 53-6 (Bryant Dep.) at 24 (Tr. at 106); ECF 53-4 (Miller Decl.), ¶¶ 19-20.  Notably, Miller testified that she did not confer with Lopez or Juarez in making this decision.  ECF 53-11 (Miller Dep.) at 9 (Tr. at 25); *see* ECF 53-10 (Juarez Decl.), ¶ 26.

As indicated, with respect to Rodgers, Bryant spoke with Sager on August 4, 2016, to discuss Rodgers's removal from the Groundbreaker contract.  ECF 53-6 (Bryant Dep.) at 25 (Tr. at 107).  Bryant claims that Sager did not request counseling for Rodgers in that conversation.  *Id.*; *see* ECF 53-9 (Bryant Decl.), ¶ 10 ("When I first spoke with Paul Sager . . . regarding Eagle

Alliance's request to remove Ms. Rodgers, I understood that he was in agreement with that request.").

Bryant did not specify the time of her initial phone conversation with Sager.  However, she testified that her telephone call with Sager preceded an email to Sager from Amanda  Hines, a "Security Compliance" employee at EA.  ECF 54-5 (Bryant Dep.) at 23 (Tr. at 116).  That email (ECF 54-8 at 3-4) was sent at 2:47 p.m. on August 4, 2016.  It is discussed, *infra*.

Initially, Bryant testified that Sager did not request counseling for Rodgers until August 5, 2016.  ECF 53-6 (Bryant Dep.) at 26 (Tr. at 108).  However, she later indicated that Sager called her to request counseling for Rodgers on the same day that she held a teleconference with Bryant about Rodgers's removal, *i.e.*, August 4, 2016.  *Id.* at 34 (Tr. at 126).  She responded: "I told him that basically it was too late for counseling, but that I could check with the management team considering that [Morgan and Johnson] were counseled."  *Id.* at 27-28 (Tr. at 109-10).  And, she added that it was too late for counseling because plaintiff "was already removed."  *Id.* at 28 (Tr. at 110).

As to the swift removal of Rodgers, Bryant claimed that because Sager did not immediately request that Eagle Alliance allow Rodgers to be counseled, Bryant did not consult Miller "regarding counseling for Ms. Rodgers."  ECF 53-9, ¶ 11.  Thus, Miller initiated the removal process for Rodgers.  ECF 53-4, ¶ 21; *see* ECF 53-9, ¶ 13.  And, as a result, Rodgers was removed from the "contractor position roster log" ("CPRL"), which  is a list of all individuals who work on the contract.  ECF 53-6 (Bryant Dep.) at 26 (Tr. at 108).  However, the record is devoid of any evidence establishing the specific time at which Miller began the removal process.

Bryant subsequently "talked to [Miller] about the possibility of counseling [Rodgers] . . . or coming back on the contract . . . ."  ECF 54-5 (Bryant Dep.) at 24 (Tr. at 118).  According to

Bryant, Miller was "fine with having [Rodgers] come back as long as it was in a different group" but, "based on their findings," Miller "did not want to consider counseling for [Rodgers]." *Id.* Further, Bryant avers that Miller told her that "because the removal process had already begun, . . . [it] could not be reversed." ECF 53-9 (Bryant Decl.), ¶ 15.

Bryant explained: "[O]nce somebody is removed [from the CPRL], then there is a ticket that goes into the system to disable their accounts and things like that." ECF 53-6 (Bryant Dep.) at 27 (Tr. at 109). According to both Bryant and Miller, upon removal, only the NSA, as the client, could have restored plaintiff to the CPRL. *Id.*; *see* ECF 53-11 (Miller Dep.) at 14 (Tr. at 37) (explaining that once a subcontractor is removed from the CPRL, action from the government would be required to reverse the process). But, Rodgers averred: "The NSA Security Officer told me that a removal is irreversible only if I had done something illegal. Otherwise, it is just a computer entry." ECF 54-12 (Rodgers Decl.), ¶ 15.

As noted, at 2:47 p.m. on August 4, 2016, Hines, a "Security Compliance" employee at Eagle Alliance, sent an email to Sager and two other COSMO employees. ECF 54-8 at 3-4 (the "Hines email"); *see* ECF 53-6 (Bryant Dep.) at 20 (Tr. at 102) (describing Hines as a member of EA's Security team); ECF 54-3 (Sager Dep.) at 17 (Tr. at 25) (describing Hines as "the security officer for Eagle Alliance"). Hines wrote, ECF 54-8 at 3: "This is a request for removal of **Kristin Rodgers.** The Subcontractor employee *is being removed* from the GROUNDBREAKER contract, effective COB today, **04 AUG. 2016.**" (Italics added; bold in original). And, the email included detailed instructions describing the process that COSMO was to follow in order to effectuate the involuntary removal.

Then, at 3:25 p.m. on August 4, 2016, Hines wrote another email to COSMO. *Id.* It said, *id.*: "I have been notified that this termination has been put on hold until further discussion between Eagle Alliance."

Critically, Sager offered a conflicting account regarding the order of events. He testified that he first learned of EA's proposed removal of Rodgers from the Hines email on August 4, 2016. ECF 54-3 (Sager Dep.) at 16 (Tr. at 24) (stating that his first notification concerning Rodgers's removal came in an email "directing [COSMO] to remove [plaintiff]"); *see id.* at 18 (Tr. at 26) (clarifying that he received the Hines email on August 4, 2016). According to Sager, upon receipt of the Hines email, he "contacted [COSMO's] security people" and asked them "to not take any actions until [he] had the opportunity to talk to Eagle Alliance regarding this decision." *Id.* at 18 (Tr. at 26).

Sager testified that he also promptly telephoned Bryant in order to request information regarding EA's decision to remove Rodgers from the Groundbreaker contract. ECF 54-3 at 19 (Tr. at 27). Bryant indicated to Sager that EA was "removing [Rodgers] for performance," including her issues with "tardiness and tickets[.]" *Id.* Of significance, Sager claims that he immediately requested counseling for Rodgers. Sager stated: "I asked [Bryant] to reconsider. I'd asked for an opportunity for [COSMO] to counsel Ms. Rogers [sic] and provide her an opportunity for corrective action." *Id.* at 19-20 (Tr. at 27-28). Moreover, Sager asserted that, as a matter of "common courtesy," he expected Eagle to notify "COSMO about issues with [its employees'] performance prior to sending [an email] saying [the employee] was to be removed . . . ." *Id.* at 20 (Tr. at 28). He explained, *id.*: "So my position is if this is the first time I'm hearing of a complaint the decision should not be to remove the person from the program."

According to Sager, his conversation with Eagle management prompted Hines to send a second email to COSMO on August 4, 2016.  As indicated, in the second email, Hines advised that Rodgers's "termination has been put on hold until further discussion between Eagle Alliance." ECF 54-8 at 3; *see* ECF 54-3 (Sager Dep.) at 20 (Tr. at 28).   Both Miller and Bryant indicated that they did not direct Hines to send the second email.  ECF 53-4 (Miller Decl.), ⁋ 24 ("Although [Hines] sent an email implying that Ms. Rodgers' removal was on hold, I never directed anyone to place Ms. Rodgers' removal on hold."); ECF 53-6 (Bryant Dep.) at 31 (Tr. at 115) (stating that she "did not know about that hold").

Sager also testified that he had a second call with Bryant the next day, August 5, 2016, to discuss again Rodgers's proposed removal from Groundbreaker.  ECF 54-3 (Sager Dep.)  at 21 (Tr. at 29).   In this conversation, Sager was informed that Lopez, Rodgers's supervisor, was "adamant about removing her from his team."  *Id.* at 22 (Tr. at 30).  According to Sager, Bryant indicated that Lopez wanted to remove Rodgers because of her "tardiness [and] low production . . . ." *Id.*

At 10:05 a.m. on August 5, 2016, Sager sent an email to four of his colleagues at COSMO. He confirmed that he had just spoken to Bryant and said, in part:  "I was hoping that they reconsidered the decision as we were not provided an oppty [opportunity] to counsel Kristin about EA's concerns (Low production, consistently late for work and that she seems not to care about either concerns [sic] that have been addressed with her over the past two months)."  ECF 54-8 at 2.  Sager added that Rodgers's supervisor, Lopez, "is adamant about removing" plaintiff from Groundbreaker.  *Id.*

At 1:05 p.m. on August 5, 2016, Sager sent Bryant a follow-up email.  ECF 54-14 at 2-3. The email indicated that Sager had spoken with Rodgers about her removal, and she disputed the

performance issues that Bryant had described to Sager.  *Id.* at 2. Further, the email provided: "Given that this is the first time in her 3 years on GB that we have heard of concerns about [Rodgers's] performance, I respectfully request that we be granted an opportunity to counsel her about these concerns.  I believe that in all fairness, [plaintiff] should be placed on probation and provided another chance." *Id.*

Bryant did not directly respond to Sager.  Instead, later that day, at 5:34 p.m., Bryant sent an email to Sager, stating: "This is a request for removal of Kristin Rodgers, COSMO.  The removal will be effective COB Today . . . She is being terminated from the contract for performance, so her services are no longer required."  ECF 54-9 at 2.  According to Bryant, this email is a "formality" that Eagle Alliance "send[s] out . . . after [the removal process] has taken place," and indicated that Rodgers's removal "was official." ECF 53-6 (Bryant Dep.) at 32 (Tr. at 124).

Nevertheless, Sager told Rodgers that he hoped to convince EA to change its mind.  ECF 54-3 (Sager Dep.) at 28-29 (Tr. at 36-37).  And, Sager testified that, to that end, he had "several" phone calls with Bryant over the following week with respect to EA's request to remove Rodgers from the Groundbreaker contract. *Id.* at 29 (Tr. at 37).  In these conversations, Sager asserted that it did not "seem fair to terminate somebody without any prior notice of concerns." *Id.* at 30 (Tr. at 38).  In response, Bryant advised Sager that EA would be willing to consider Rodgers "for another position, not within the same group." *Id.*

On August 12, 2016, COSMO issued a letter to Rodgers, terminating her employment. ECF 53-14 (Termination Letter).  The Termination Letter stated: "Unfortunately, we have been unable to identify another task/position for you to support at this time. . . ." *Id.*  But, the Termination Letter added that COSMO would "continue [its] search." *Id.*  And, it concluded: "We

regret the need to take this action.   If another position becomes available that meets your qualifications, we will contact you." *Id.*   Bryant avers: "COSMO did not consult with Eagle Alliance regarding its decision to terminate Plaintiff's employment."  ECF 53-9 (Bryant Decl.), ‖ 16.

Toward the end of August 2016, Rodgers "told Mr. Sager that [she] believed [she] had been discriminated against due to [her] sex and that [she] intended to file a complaint."  ECF 54-12 (Rodgers Decl.), ‖ 16.   Sager responded: "'I wish you wouldn't do that or you'll get blackballed.'" *Id.*

Nonetheless, on September 8, 2016, Rodgers filed a Charge of Discrimination with the EEOC, alleging sex discrimination.  ECF 53-1 at 19.  On September 15, 2016, the EEOC sent a notice of plaintiff's charge to EA's Executive Vice President and Chief Human Resources Officer, John Reing.  ECF 54 at 13; *see* ECF 54-18 (September 15 Notification).  And, the EEOC sent notices to EA's attorneys on October 14, 2016, and October 19, 2016, respectively.  ECF 54 at 13; *see* ECF 54-19 (October Notifications).[19]

In their sworn declarations, Bryant and Juarez state that they were unaware of Rodgers's charge until November 15, 2016, when they were contacted by EA's attorney to discuss the matter. ECF 53-9 (Bryant Decl.), ‖ 17; ECF 53-10 (Juarez Decl.), ‖ 31; *see also* ECF 53-6 (Bryant Dep.) at 38 (Tr. at 144) (confirming that "EA became aware that Ms. Rodgers intended to file a discrimination complaint against EA" in the "November/December timeframe in 2016"). Defendant indicates that until November 15, 2016, Lopez was also unaware of the EEOC charge

---

[19] These notifications were directed to an attorney named Nicole Seale Adler, with the Kullman Firm.  ECF 54-19 at 2, 3.  The Kullman Firm serves as defense counsel here.  Ms. Adler has not entered an appearance, however.  *See* Docket.

that Rodgers filed.  But, they have not presented any evidence from Lopez to that effect.  *See* ECF 53-1 at 33.  And, Miller testified that she remained unaware of plaintiff's charge until "probably January or February [2021] . . . ."  ECF 53-11 (Miller Dep.) at 20 (Tr. at 51).[20]

Following Rodgers's removal from the Groundbreaker contract and her termination by COSMO, Sager continued to search for new employment opportunities for plaintiff.  To that end, on September 15, 2016, Sager sent Rodgers an email indicating that he had sent her resume to EA in connection with applications for three different positions on the Groundbreaker contract.  ECF 54-20 at 3 (email from Sager to Rodgers); *see* ECF 53-6 (Bryant Dep.) at 37 (Tr. at 129) (confirming that "there were . . . three Ground Breaker [sic] contract positions that Ms. Rodgers applied for or Mr. Sager tried to get for Ms. Rodgers").

However, according to Sager, he did not receive a response from EA in connection with these applications for several weeks.  ECF 54-3 (Sager Dep) at 32-33 (Tr. at 45-46).  And, on October 17, 2016, Sager sent Rodgers an email, stating: "Want to let you know that I heard back from EA Staffing Mgr regarding the weekend positions on [Groundbreaker].  I am sorry to tell you that she says that it doesn't appear that the hiring manager is interested in reaching out to you about those positions."  ECF 54-20 at 4-5.[21]

At her deposition, Bryant could not recall who decided not to interview plaintiff for a Groundbreaker position.  ECF 53-6 (Bryant Dep.) at 38 (Tr. at 144).  But, she affirmed that "she had spoke[n] to Paul Sager with respect to limitations that Ms. Rodgers had," and that he told her

---

[20] Miller never specified the year, and counsel failed to clarify the omission.  But, it appears that Miller was referring to 2021.

[21] Rodgers responded to Sager's email, asking: "Do you know who is the hiring manager?" ECF 54-20 at 4.  In his reply, Sager stated that he did not know the hiring manager's identity.  *Id.*

that Rodgers "only wanted to work 1 a.m. to 9 a.m. and didn't want any other shift." *Id.* at 39 (Tr. at 171).[22]  Indeed, Sager testified that after Rodgers was removed from the Groundbreaker contract, he confirmed that she was only interested in working an overnight shift. ECF 53-7 (Sager Dep.) at 9 (Tr. at 57).  But, Rodgers disputes this claim, contending that she told Sager to submit her resume for positions with daytime shifts.  ECF 54-7 (Rodgers Dep.) at 35 (Tr. at 236).

In Sager's email to plaintiff of October 17, 2016, Sager informed Rodgers that there was "another program" for which Rodgers might apply.  ECF 54-20 at 5.  To that end, Sager advised Rodgers that Lisa Goodman, the Chief Operating Officer ("COO") for COSMO, planned on contacting her to see if she would be "interested in being considered for one of those positions." *Id.*; *see* ECF 54-3 (Sager Dep.) at 21 (Tr. at 29) (identifying Goodman as the COO of COSMO).

Thereafter, on October 19, 2016, Goodman sent an email to Rodgers to gauge her interest in a position on a contract called "Enterprise Service Operations Center" ("ESOC"), on which COSMO served, in the capacity of a subcontractor to CSRA.  *See* ECF 54-21 at 2-3.  After discussing the position with Rodgers, Goodman submitted an application for the position on Rodgers's behalf.  *Id.* at 4-5.

On November 3, 2016, Rodgers filed a second charge with the EEOC, alleging retaliation. ECF 53-1 at 19; *see* ECF 54-1, ¶ 62.  The next day, November 4, 2016, CSRA expressed its interest in conducting a phone interview with Rodgers.  ECF 54-21  at 5.  And, on November 7, 2016, Rodgers accepted a meeting invitation from a CSRA official named Michelle McNutt, titled: "Phone Screen—Kristin Rodgers—COSMO."  ECF 54-22 at 2.  It was scheduled to occur the following day, November 8, 2016.  *Id.*

---

[22] The record does not reflect the date when Sager and Bryant discussed Rodgers's shift preferences.

Juarez served as the hiring manager on the ESOC contract.  ECF 53-10, ⁋ 28.   And, on the morning of November 18, 2016, Juarez sent McNutt an email, stating: "I personally fired Kirstin Rodgers from Ground Breaker [sic] and do not wish to have her on my staff."  ECF 53-15 at 1. McNutt responded, in relevant part: "I will let the sub know.  This saved everyone some time." *Id.*  Soon thereafter, McNutt canceled the interview.  *See* ECF 54-22 at 3; ECF 54-23 (email dated November 9, 2016, between Goodman and Rodgers, indicating cancellation of Rodgers's interview).

In his Declaration, Juarez explained: "I declined to interview Ms. Rodgers solely based on my prior experience with [Ms. Rodgers's] performance on the Groundbreaker contract."  ECF 53-10, ⁋ 29.   Further, he claimed that the position "required a Security+ clearance as a condition of hire."  *Id.* ¶ 30.   Rodgers concedes that she did not acquire the necessary certifications to obtain such a clearance until November 2020.   ECF 53-5 (Rodgers Dep.) at 5 (Tr. at 74).

However, according to Miller, when CSRA began work on the ESOC contract, it believed that its workers required only a "level one certification . . . ."  ECF 54-16 (Miller Dep.) at 4 (Tr. at 49).   CSRA later learned that a Security-plus certification was needed.  *Id.*   Therefore, it provided the subcontractors who had already been hired three to four weeks to obtain the certification, or risk their removal from the contract.  *Id.* at 4-5 (Tr. at 49-50).   Nevertheless, "there was a time where [CSRA] . . . cut that off and no longer hired anybody new [without the certification]."  *Id.* at 5 (Tr. at 50).[23]

Rodgers indicated that after the interview was cancelled, she had a "telephone conversation with Ms. Goodman regarding Defendants' decision not to hire [her] for the ESOC contract."  ECF

---

[23]  The parties have not presented evidence indicating whether the Security-plus certification was a precondition for hire at the time that Rodgers applied.

54-12 (Rodgers Decl.), ¶ 17.  According to Rodgers, Goodman told her: "Defendants did not want [plaintiff] to work there because [she] 'made complaints.'"  *Id.*  Further, Rodgers testified that during this phone call Goodman stated: "[T]hey are aware of who you are.  They canceled the interview.  They don't want you returning back."  ECF 54-7 (Rodgers Dep.) at 36 (Tr. at 244).

With the Motion, the EA Defendants presented testimony from Sager establishing that another COSMO employee, Gary Weir, was removed from the Groundbreaker contract without providing COSMO an opportunity for counseling.  ECF 53-7 (Sager Dep.) at 10-11 (Tr. at 58-59).  According to Sager, Weir worked on Groundbreaker as a subcontractor for EA, beginning in 2013.  *Id.*  But, Weir worked on "a help desk" in San Antonio, Texas.  *Id.* at 12 (Tr. at 60).  He was supervised by Lopez.  *Id.*

In May 2016, COSMO "received . . . notice that [Weir] was being removed immediately without any opportunity to cancel [sic] him."  *Id.* at 11 (Tr. at 59).  Bryant testified that, as with Rodgers, Miller was the EA official who determined that Weir's removal from the contract was appropriate.  ECF 53-6 (Bryant Dep.) at 35-36 (Tr. at 127-28).  Bryant added that Miller "probably would have conferred with [Lopez]" in making the decision.  *Id.* at 36 (Tr. at 128).

Sager claimed that EA told him that Weir was removed because he "was not a team player."  ECF 53-7 (Sager Dep.) at 11; 12 (Tr. at 59; 60).  But, he could not recall whether EA gave COSMO any reasons for not placing Weir on probation prior to removing him.  *Id.* at 12 (Tr. at 60).  Conversely, Bryant testified that Weir was removed because EA "really needed to replace him with somebody that [sic] was more highly skilled.  He was very junior at the time, [and] didn't have the skills needed to be successful in that job."  ECF 53-6 (Bryant Dep.) at 36 (Tr. at 128).  Notably, however, Weir's removal occurred one month before the report card system was

30

implemented, in June 2016.  *See* ECF 53-10 (Juarez Decl.), ⁋ 19.  As a result, his productivity and attendance were not measured by the report card system.

In contrast to plaintiff, Weir was rehired by EA on September 24, 2018, to work as a Help Desk Technician on a different contract.  ECF 53-6 (Bryant Dep.) at 36 (Tr. at 128).  Bryant observed that, in the interim, "[h]e had gone to another contract and he had gotten . . . a lot of skills in that position."  *Id.* at 37 (Tr. at 129).

On October 31, 2019, the EEOC issued a "Determination" as to Rodgers's discrimination charge and another one as to her retaliation charge.  *See* ECF 54-25 (copy of EEOC determinations).[24]  As to Rodgers's claim for sex discrimination, the EEOC noted that, although COSMO was Rodgers's employer, "it was solely [EA's] decision as to whether [Rodgers] along with her two male comparators were to remain on the job . . . ."  *Id.* at 2.  Further, the EEOC pointed out that Morgan and Johnson both had performance issues, yet they were not discharged.  *Id.*  It reasoned that because EA "decided to remove [Rodgers] from the job and only gave Mr. Morgan and Mr. Johnson two-week probations," it was "reasonable to believe that [Rodgers] was discharged based on her sex."  *Id.*

With respect to Rodgers's retaliation charge, the EEOC determined that there was reasonable cause to believe that EA had retaliated against Rodgers for engaging in a protected activity.  *Id.* at 4-5.  In particular, it found it notable that, following plaintiff's charge for sex discrimination, Rodgers was not selected for any of the positions with Eagle Alliance for which she had applied.  *Id.* at 4.  Moreover, the EEOC pointed out that although the EA Defendants had

---

[24] EEOC reports and findings have been found admissible under the exception to hearsay rule for reports of public agencies, as outlined in Fed. R. Evid. P. 803(8).  *See Blake v. Waccamaw Reg'l Planning and Dev. Council of Georgetown S.C.*, 45 F.3d 425, at *1 (4th Cir. 1994); *Barfield v. Orange County*, 911 F.2d 644, 649-50 (11th Cir. 1990).

claimed that they had been told that Rodgers was not interested in working an overnight shift, there was "no evidence to show that [Rodgers] ever stated that she only wanted an overnight shift." *Id.*

## II.  Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017). To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law. *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d

199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24. And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the

function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). That said, "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'" *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)). In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).

### III.   Discussion

### A.   Defendants' Contentions

The EA Defendants argue that summary judgment as to plaintiff's claims is warranted because liability under Title VII attaches only as to a plaintiff's employer. ECF 53-1 at 20-21. And, in their view, they did not share an employment relationship with Rodgers. *Id.* at 21-23.

Further, the EA Defendants contend that, even if they were plaintiff's employer, Rodgers's claims fail as a matter of law because she has failed to establish a prima facie case of sex discrimination or retaliation. With respect to plaintiff's sex discrimination claim, the EA defendants posit: (1) Rodgers's performance was unsatisfactory; (2) plaintiff cannot establish that male subcontractors received more favorable treatment; and (3) the EA Defendants are entitled to a presumption against discrimination "because the ultimate decisionmaker—Ms. Miller—falls within the same protected category (*i.e.*, female) as Plaintiff . . . ." *Id.* at 23.

As to plaintiff's retaliation claim, the EA Defendants argue that, to the extent plaintiff's claim is predicated on Michaels's complaint to Miller about Lopez's treatment of Rodgers, it is without merit because it would have been Michaels, not Rodgers, who participated in protected

activity.  *Id.* at 30-31.  And, regarding plaintiff's EEOC charges, the EA Defendants contend that the claim fails because plaintiff cannot establish any causal link between an adverse employment action and plaintiff's protected activity.  *Id.* at 31-34.

In addition, the EA Defendants maintain that even if the Court finds that plaintiff has presented a prima facie case for either sex discrimination or retaliation, summary judgment is appropriate because plaintiff was removed from the Groundbreaker contract for a non-discriminatory, non-retaliatory reason, *i.e.*, her poor performance.  *Id.* at 34-36.

In my view, the undisputed evidence shows that EA Defendants qualify as Rodgers's employer under the precedent set forth by the United States Court of Appeals for the Fourth Circuit.  And, plaintiff has presented sufficient evidence to show that there is a genuine dispute of material fact as to her claim for sex discrimination.  Thus, summary judgment would be inappropriate as to Count 1.  In contrast, as I see it, there is no genuine dispute as to a material fact pertaining to Rodgers's claim for retaliation.  Therefore, the EA Defendants are entitled to summary judgment with respect to Count 2.

## B.  Joint Employer Doctrine

Defendants insist that the EA Defendants did not employ plaintiff.  To the contrary, they assert that "she was employed solely by COSMO."  ECF 53-1 at 20.

An entity need not be a plaintiff's sole employer in order to be liable under Title VII. Rather, under the joint employer doctrine, it may be a "joint employer" if it exercises sufficient control over the terms and conditions of the plaintiff's employment.  *Butler v. Drive Automotive Industries of America, Inc.*, 793 F.3d 404, 408 (4th Cir. 2015); *see Sanders v. Bernhardt*, 1:19-cv-712, 2020 WL 6323731, at *2-3 (E.D. Va. Oct. 28, 2020), *aff'd sub. nom. Sanders v. Haaland*, No. 20-2299, 2021 WL 6067243 (4th Cir. Dec. 20, 2021) (per curiam); *Delarosa v. Comsource*

*Mgmt., Inc.*, GJH-20-3174, 2021 WL 3857813, at *4 (D. Md. Aug. 30, 2021); *Erbe v. Campbell*, GLR-20-3266, 2021 WL 1890610, at *5 (D. Md. May 11, 2021); *Mason v. Sun Recycling, LLC*, GLS-18-2060, 2020 WL 1151046, at *6-7 (D. Md. Mar. 9, 2020); *Goldstein v. Univ. of Md.*, CCB-18-2376, 2019 WL 4467035, at *5 (D. Md. Sept. 17, 2019); *Dreher v. Maryland*, GLR-17-3832, 2019 WL 528192 at *3-4 (D. Md. Feb. 11, 2019).

The joint employer doctrine "specifically aims to pierce the legal formalities of an employment relationship to determine the loci of effective control over an employee, while not discounting those formalities entirely. Otherwise, an employer who exercises actual control could avoid Title VII liability by hiding behind another entity." *Butler*, 793 F.3d at 415. Moreover, "'Title VII should be liberally construed in light of its remedial purpose,' and . . . this broad interpretation extends to the definition of 'employer[.]'" *Evans v. Md. State Highway Admin.*, JKB-18-935, 2018 WL 4733159, at *6 (D. Md. Oct. 2, 2018) (quoting *Lee v. Mattis*, PX-17-2836, 2018 WL 3439261, at *9 (D. Md. July 17, 2018)).

The Fourth Circuit recently reviewed the nine factors pertinent to the determination of whether an entity qualifies as a joint employer. *Smith v. CSRA*, 12 F.4th 396 (4th Cir. 2021). The factors are as follows, *id.* at 414:

(1) authority to hire and fire the individual;

(2) day-to-day supervision of the individual, including employee discipline;

(3) whether the putative employer furnishes the equipment used and the place of work;

(4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;

(5) the length of time during which the individual has worked for the putative employer;

(6) whether the putative employer provides the individual with formal or informal training;

(7) whether the individual's duties are akin to a regular employee's duties;

(8) whether the individual is assigned solely to the putative employer; and

(9) whether the individual and putative employer intended to enter into an employment relationship.

These factors are "not dispositive," however, and control remains the "'principal guidepost' in the analysis." *Butler,* 793 F.3d at 414 (quoting *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 448 (2003)). Moreover, the first three factors, which are all related to control, are the most important in determining whether there is joint employment. *CSRA, Inc.*, 12 F.4th at 414. In contrast "the ninth factor regarding the subjective intention of the parties ordinarily will be of minimal consequence in the joint employment analysis." *Butler*, 793 F.3d at 414 n.12.

A balancing of these factors weighs heavily against the EA Defendants' position. As to the first factor, it is evident that plaintiff entered a formal employment relationship with COSMO. *See* ECF 53-3 (Offer Letter). And, COSMO retained authority to terminate Rodgers's term of employment. ECF 53-14 (Termination Letter); *see* ECF 53-9 (Bryant Declaration), ¶ 16 (stating that COSMO did not consult with the EA Defendants in regard to Rodgers's termination). But, it is also plain that plaintiff's initial hiring by and continued employment with COSMO was predicated on EA's acceptance of plaintiff for work on the Groundbreaker contract, over which Eagle had substantial authority.

It is undisputed that plaintiff interviewed with EA managers for the position and they, in turn, provided feedback to COSMO regarding plaintiff's suitability for a Help Desk position. *See* ECF 54-7 (Rodgers Dep.) at 3 (Tr. at 86). Indeed, the Offer Letter reflected that plaintiff would

not be paid until she was formally approved by EA.  ECF 53-3 (Offer Letter); *see* ECF 54-3 (Sager Dep.) at 12 (Tr. at 20) (confirming that plaintiff would remain in "non-pay status pending approval" from Eagle Alliance).   EA also made the decision to remove plaintiff from the Groundbreaker contract, which then led to her termination by COSMO.   *See* ECF 53-14 (Termination Letter).

It is undisputed that plaintiff received two raises during her tenure on the Groundbreaker Contract.  ECF 54-11 (Salary Recommendation Forms).  And, Rodgers claimed that these raises required EA's assessment of plaintiff.  ECF 54-7 (Rodgers Dep.) at 25 (Tr. at 155).  However, Sager testified that although he tried to contact an Eagle manager to determine whether to award Rodgers a salary increase, he was not able to reach any EA official to discuss the matter.  *See* ECF 54-3 (Sager Dep.) at 11, 15 (Tr. at 17, 23).

The EA Defendants advanced testimony establishing that their staff lacked authority to discipline or counsel plaintiff.  *See* ECF 53-9 (Bryant Decl.), ¶¶ 4-5.  The assertion is belied by the record.  Certainly, the EA Defendants provided training to plaintiff.  They also had the sole authority to remove plaintiff from the Groundbreaker contract.  *See* ECF 53-6 (Bryant Dep.) at 7 (Tr. at 8); ECF 54-3 (Sager Dep.) at 4-5 (Tr. at 10-11).

At all relevant times, plaintiff was supervised by EA staff.  *See* ECF 54-5 (Bryant Dep.) at 7-8 (Tr. at 12-13).  Rodgers's direct supervisor, an EA employee, implemented a report card system for the purpose of tracking Help Desk staff's "punctuality, productivity and overall performance."  ECF 53-10 (Juarez Decl.), ¶ 9.  Plaintiff presented uncontroverted testimony that Juarez met with subcontractors who worked on the Help Desk, including plaintiff, in order to address performance issues.  *See* ECF 54-7 (Rodgers Dep.) at 26-33 (Tr. at 156-64).  And, Eagle

Alliance made decisions to remove subcontractors based on the information gleaned from the report cards. *See* ECF 53-10, ¶¶ 20-24.

Moreover, Eagle determined the location where plaintiff worked. *See* ECF 54-3 (Sager Dep.) at 7 (Tr. at 13); ECF 54-7 (Rodgers Dep.) at 18 (Tr. at 125). Rodgers worked for almost three years for the EA Defendants at an Eagle facility. ECF 54-3 (Sager Dep.) at 3 (Tr. at 9). And, at the direction of EA, plaintiff worked at an NSA facility for about a two-month period, without COSMO's knowledge or permission. ECF 54-7 (Rodgers Dep.) at 18 (Tr. at 125); *id.* at. 21 (Tr. at 129).

The EA Defendants do not discuss the third factor, which obviously cuts against their claim. EA furnished the equipment that plaintiff used and controlled the timing of plaintiff's shift. *See* ECF 54-3 (Sager Dep.) at 7, 8-9 (Tr. at 13, 14-15); ECF 54-5 (Bryant Dep.) at 4, 5-7 (Tr. at 8, 10-12); ECF 54-7 (Rodgers Dep.) at 6-7 (Tr. at 97-98).

The most important factors militate in favor of a joint employment relationship. As to the remaining six factors, only two seem to weigh in favor of the EA Defendants. With respect to the fourth factor, it is undisputed that EA did not maintain any employment, payroll, personnel, insurance, or tax records regarding subcontractors, including plaintiff. ECF 53-9 (Bryant Decl.), ¶ 8. And, concerning the ninth factor, there is no argument in opposition to EA's claim that it did not intend to enter an employment relationship with its subcontractors. *Id.* ¶ 9.

On the other hand, the fifth, sixth, seventh, and eighth factors all indicate that EA had substantial control over Rodgers's employment. Plaintiff worked as a subcontractor for EA on an exclusive basis for approximately three years. *See* ECF 54-3 (Sager Dep.) at 3-5 (Tr. at 9-11) (discussing the length of plaintiff's employment with COSMO and her assignment on the Groundbreaker contract); ECF 54-12 (Rodgers Decl.), ¶ 4 ("[D]uring the entire period that I

worked at EA, COSMO solely assigned me to work at EA, and the EA job was a full-time job.").

Further, EA trained Rodgers with respect to her role and responsibilities on the Help Desk. *See*

ECF 54-3 (Sager Dep.) at 9 (Tr. at 15); ECF 54-5 (Bryant Dep.) at 5-6 (Tr. at 10-11).  And, Rodgers

worked directly with other EA employees while working on the Groundbreaker contract. *See* ECF

53-13 at 3 (description of Eagle Alliance employee working on the Help Desk, performing the

same tasks as Rodgers).

     The EA Defendants point to two cases that, in their view, present circumstances materially

similar to those at issue here, where the presiding court nonetheless found that the joint employer

doctrine did not apply.  ECF 53-1 at 22-23 (citing *Greene v. Harris Corp.*, 653 F. App'x 160, 164

(4th Cir. 2016) and *Kellum v. Isle of Wight City, Va.*, 2:18-CV-543, 2020 WL 3164962, at *10

(E.D. Va. Feb. 13, 2020), *report and recommendation adopted*, 2:18-cv-543, 2020 WL 1304083

(E.D. Va. Mar. 19, 2020), appeal dismissed, No. 20-1463 (4th Cir. May 6, 2020)).  Both cases are

distinguishable.

     In *Kellum*, 2020 WL 3164962, at *1-2, the plaintiff brought discrimination and retaliation

claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111 *et seq.* against

Gerald Gwaltney, the Commissioner of Revenue of the Isle of Wight, and the County of the Isle

of Wight (the "County").  Plaintiff had worked for the Commissioner of Revenue for a period of

eight years before she was terminated.  *Id.* at *1.

     Pertinent here, the court explained that the plaintiff could not lodge a claim under the ADA

against the County pursuant to the joint employer doctrine.  *Id.* at *7-10.[25]  The court observed that

---

[25] The *Kellum* Court noted that the Fourth Circuit had not expressly adopted the joint employer doctrine in the context of a discrimination claim arising under the ADA, but indicated that it did not see "any persuasive reason why the joint employer doctrine does not or should not apply in the ADA context."  *Kellum*, 2020 WL 3164962, at *7 n.5.

Gwaltney had the exclusive authority to hire and fire employees working in the office of the Commissioner of Revenue; the plaintiff was supervised by Commissioner of Revenue employees; and Gwaltney took actions to "furnish [plaintiff] any equipment she needed to perform her work," including the purchasing of a daily planner, and offered to purchase software to facilitate plaintiff's work.  *Id.* at *9.  The court acknowledged that the County possessed plaintiff's employment records, but highlighted that the record "demonstrate[d] that Gwaltney . . . specifically allowed for payment of his staff through the County."  *Id.*

Thus, the *Kellum* Court concluded, *id.* at *10: "Taking all these factors into consideration, and mindful of the Fourth Circuit's focus on control, Gwaltney and the County are not joint employers" because "it is evident from the record that Gwaltney had the requisite control over [plaintiff] to be her employer."  And, in its view, because "the most functional aspects of [plaintiff's] employment were controlled by Gwaltney as the Commissioner of Revenue," there "was no genuine dispute of material fact that the County and Gwaltney did not jointly employ [the plaintiff]."[1]  *Id.*

In *Greene*, 653 F. App'x 160, the plaintiff was employed as a janitor by a firm called Eurest Service, Inc. ("Eurest").  She was assigned to provide cleaning services at the office of the defendant, Harris Corporation ("Harris").  *Id.* at 161.  Plaintiff claimed that while working at the defendant's office, one of defendant's employees subjected her to discriminatory conduct based on her sexual orientation and personal appearance, in violation of local anti-discrimination laws. *Id.*  She sued Harris and its employee under the joint employment doctrine.

---

And, in the time since *Kellum* was decided, the Fourth Circuit has applied the joint employer doctrine to a claim arising under the ADA.  *See CSRA, Inc.*, 12 F.4th at 414.

The plaintiff alleged that Harris had the ability to interview prospective janitorial workers and could accept or reject a potential worker based upon the worker's experience. *Id.* at 164. Further, the complaint asserted that Harris supplied the plaintiff with cleaning supplies, chose the days on which the plaintiff worked, and a Harris employee supervised the plaintiff while on site. *Id.* The district court dismissed plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(6), on the ground that plaintiff had not alleged facts that, if proven, would establish that she was an employee of Harris, as was required by the relevant local anti-discrimination statute. *Id.* at 161. The Fourth Circuit affirmed. *Id.*

The Fourth Circuit noted that plaintiff did not "allege that she [had] actually met with or received any direction from any Harris supervisor during the few hours . . . that she was present at Harris' facility." *Id.* at 164. And, the Court pointed out that the plaintiff "ha[d] not alleged that her duties were related to Harris' business product, or that she performed work that was also undertaken by Harris employees." *Id.* Thus, the Fourth Circuit determined that the plaintiff had failed to plead facts that, if proven, would satisfy the requisite factors. *Id.* It explained, *id.*:

> Our concern with the putative employer's authority to hire and fire in *Butler* arose from the circumstances of the staffing agency-client relationship, namely, that the client could terminate staffing agency employees who were performing the work of the client, as it could its own direct employees. In contrast, here, Harris' authority to approve or reject Eurest employees arises from its authority to ensure that the services contract is performed to Harris' satisfaction.
>
> The factors set forth in *Butler* are not intended for mechanical application, but instead provide a framework to elicit the true nature of a putative employment relationship. In the present case, considering all the facts alleged in Greene's complaint, we conclude that the contractual arrangement between Eurest and Harris is not analogous to the staffing agency-client relationship that supported our conclusion of a joint employment relationship in *Butler*. Instead, the contractual provisions cited by Greene describe a contract for janitorial services between a vendor of those services and its business client. We therefore hold that the district court did not err in concluding that Greene failed to state a claim of discrimination on which relief can be granted.

42

Here, Rodgers was functionally an employee of the EA Defendants. The undisputed evidence establishes that Rodgers's employment with COSMO was contingent upon her approval by EA employees. ECF 53-3; ECF 54-7 (Rodgers Dep.) at 3, 4 (Tr. at 86, 90). And, EA had the authority to remove plaintiff from her position. ECF 54-3 (Sager Dep.) at 4-5 (Tr. at 10-11). In plaintiff's role as a Help Desk Technician on the Groundbreaker contract, she worked for a period of approximately three years, with other EA employees and subcontractors, all under the close supervision of EA management, at locations designated by Eagle. *See id.* at 3-5 (Tr. at 9-11) (discussing plaintiff's tenure with Eagle Alliance); ECF 53-11 (Miller Dep.) at 10 (Tr. at 29) (emphasizing the importance of Help Desk's productivity for Eagle Alliance's success); ECF 53-10 (Juarez Decl.), ¶¶ 9-10 (describing report card system). Her hours of work were also set by Eagle. *See* ECF 54-3 (Sager Dep.) at 7 (Tr. at 13); ECF 54-7 (Rodgers Dep.) at 6-7, 18 (Tr. at 97-98, 125).

In my view, the EA Defendants are not entitled to summary judgment on the ground that Eagle was not plaintiff's employer.

### C. Title VII Generally

As mentioned, plaintiff brings two claims under Title VII. Count 1 asserts a claim of sex discrimination and Count 2 alleges retaliation.

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. *See Roberts v. Glenn Industrial Group, Inc.*, 998 F.3d 111, 117 (4th Cir. 2021). The Supreme Court has referred to discrimination based on one of the five characteristics specified above as "status-based discrimination." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351 (2013). The

proscription is "often referred to as the 'disparate treatment' (or 'intentional discrimination') provision . . . ."  *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015). Moreover, "terms, conditions or privileges of employment" is "an expansive concept."  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (quotation marks and citation omitted).

Title VII also bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participation in a Title VII investigation or proceeding.  In 42 U.S.C. § 2000e-3, it states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *See*, *e.g.*, *Sempowich v. Tactile Systems Technology, Inc.*, 953 F.4th 643, 649-50 (4th Cir. 2021); *Roberts*, 998 F.3d at 122; *Kitlinski v. United States Dep't of Justice*, 994 F.3d 224, 232 (4th Cir. 2021); *Evans v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F.3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

Before filing suit under Title VII, a plaintiff must exhaust administrative remedies.  *See Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989) (private sector employees), *superseded on other grounds by* 42 U.S.C. § 1981(b); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976) (federal employees); *see also McCray v. Md. Dep't of Trans.*, 662 Fed. App'x 221, 224 (4th Cir. 2016).  However, exhaustion under Title VII is not jurisdictional. It is,

44

instead, a "claim-processing rule[ ] that must be timely raised to come into play." *Fort Bend Cty. v. Davis*, ____U.S. ___, 139 S. Ct. 1843, 1846 (2019).

In general, at trial a plaintiff "may establish a discrimination claim under Title VII through two avenues of proof." *Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Nassar*, 570 U.S. 338). The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997); *see Thomas*, 715 F. App'x at 302. The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Young v. United Parcel Serv., Inc.*, 569 U.S. 206, 228-29 (2015) (construing the Pregnancy Discrimination Act); *Sempowich*, 19 F.4th at 649-50 (outlining the two approaches); *Guessous*, 828 F.3d at 216 (discussing the *McDonell Douglas* framework).

The *McDonnell Douglas* proof scheme is "a procedural device, designed only to establish an order of proof and production" at trial. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). It is intended to be flexible, "not onerous," and is designed to uncover "circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). However, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

Although the avenues of proof pertain to trial, they are also relevant at the summary judgment stage. "To survive a motion for summary judgment on a Title VII disparate treatment

claim, a plaintiff must either proceed under the mixed-motive framework or the *McDonnell Douglas* burden-shifting framework." *Sempowich*, 19 F.4th at 649; *see Perkins v. Int'l Paper Co.*, 936 F.3d 196, 206 n.4 (4th Cir. 2019). Reference to these methodologies serves to inform a court's evaluation of a motion for summary judgment. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that a Title VII plaintiff may avoid summary judgment by proceeding under the framework established in *McDonnell Douglas Corp.*); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas*").

If the plaintiff chooses to proceed under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Cent. Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, it "is 'not intended to be an inflexible rule.'" *Young*, 575 U.S. at 228 (citation omitted). And, even under the *McDonnell Douglas* approach, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *Burdine*, 450 U.S. at 253); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019); *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011).

To establish a prima facie claim of discrimination under the burden-shifting framework set forth in *McDonnell Douglas*, the plaintiff must demonstrate "'(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from

46

similarly situated employees outside the protected class.'" *Goode v. Cent. Va. Legal Aid Soc., Inc.*, 807 F.3d 619, 626 (4th Cir. 2015) (citation omitted); *see also Sempowich*, 19 F.4th at 649-50; *Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019) (per curiam).

As to the satisfactory job performance factor, a plaintiff need not "show that he was a perfect or model employee.  Rather, a plaintiff must only show that he was qualified for the job and that he was meeting his employer's legitimate expectations." *Haynes*, 922 F.3d at 225; *see Sempowich*, 19 F.4th at 649-50.  And, with regard to adverse action, it must have "occurred under circumstances that raise a reasonable inference of unlawful discrimination . . . ." *Sempowich*, 19 F.4th at 650 (citing *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 n.8 (4th Cir. 2020)); *Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007)).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action.  *Hoyle*, 650 F.3d at 336; *see Reeves*, 530 U.S. at 142; *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam).  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255.  In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11.  The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had

to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens . . . is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

### D. Count 1: Sex Discrimination

It is undisputed that plaintiff's gender puts her in a protected class. Further, it is uncontested that her removal from the Groundbreaker contract constituted an adverse employment action. However, the EA Defendants contend that Count 1 fails as a matter of law because plaintiff did not demonstrate that she met the employer's legitimate performance expectations. ECF 53-1 at 24-26. The defense also maintains that similarly situated male subcontractors did not receive more favorable treatment than plaintiff. *Id.* at 26-28.

In addition, Eagle contends that, even if the Court finds that plaintiff has established a prima facie case of sex discrimination, "those claims would still fail because of Defendants'

legitimate, non-discriminatory, non-retaliatory reasons for removing Plaintiff—her poor attendance and low productivity as reflected in the report cards." *Id.* at 34. And, the EA Defendants argue that they are entitled to a presumption against discrimination because Miller, the relevant decisionmaker with respect to plaintiff's removal, is also a woman. *Id.* at 28-29.

### 1.  Disparate Treatment

As I see it, there are material facts in dispute with respect to whether the EA Defendants treated plaintiff less favorably than similarly situated male subcontractors.  Two male subcontractors, Drapier Johnson and Al-Wayne Morgan, had comparable performance issues during a comparable period using a comparable metric, *i.e.*, the report card system in June and July of 2016.  Indeed, they completed fewer tasks per shift than did Rodgers during June and July 2016.  *See* ECF 53-12 (report cards); ECF 54-5 (Bryant Dep.) at 17 (Tr. at 94) (discussing reports in report cards for Morgan, Johnson, and Rodgers).   Nonetheless, Johnson and Morgan were permitted to be counseled and were put on probation for a two-week period.  In contrast, plaintiff was removed from the Groundbreaker contract without the opportunity for counseling.  *See* ECF 53-6 (Bryant Dep.) at 19-26 (Tr. at 101-08).  And, in the light most favorable to plaintiff, Sager made a prompt request to EA for counseling of plaintiff.  Indeed, a jury could readily determine that EA's assertion to the contrary is specious.

The EA Defendants contend that Johnson, Morgan, and plaintiff were treated alike; EA sought to remove all three people.  ECF 53-1 at 27.  They argue that Johnson and Morgan were only provided with counseling because their respective employers "promptly objected" to removal; as soon as Bryant informed the employers of the proposed removal, the employers requested an opportunity to counsel them.  *Id.*; *see* ECF 53-6 (Bryant Dep.) at 19-24 (Tr. at 101-06).  In contrast, according to the EA Defendants, COSMO did not request an opportunity for counseling of Rodgers

until hours after COSMO was notified of the intention to remove plaintiff.  ECF 53-1 at 28.  In support of their contention, the EA Defendants point to Bryant's deposition testimony, in which she claimed that when she told Sager about Rodgers's removal, he appeared to acquiesce.  ECF 53-6 at 25 (Tr. at 107); ECF 53-9 (Bryant Decl.), ¶ 10.

According to Eagle, because COSMO did not immediately request counseling for plaintiff, Bryant did not ask Miller if she would consider counseling for Rodgers, rather than require her removal.  ECF 53-9, ¶ 11.  As a result, EA began the removal process for Rodgers.  ECF  53-4 (Miller Decl.), ¶¶ 21-22.  And, according to the EA Defendants, this process could only be reversed by the client, the NSA.   ECF 53-6 (Bryant Dep.) at 26-27 (Tr. at 108-09); ECF 53-11 (Miller Dep.) at 14 (Tr. at 37).

Consequently, in the EA Defendants' telling, even though Sager later requested counseling for Rodgers, by then it was too late.  *See* ECF 53-6 at 27-28 (Tr. 109-10).[26]  But, Eagle maintains that it would have allowed counseling for Rodgers if it had "been made aware of a timely request from COSMO."  ECF 53-1 at 28.  In Eagle's view, the evidence, "[a]t worst," merely "establishes a miscommunication" between Bryant and Sager, which does not suffice to demonstrate a pretext. *Id.*

In sum, the EA Defendants aver that they did not treat Rodgers differently from Johnson and Morgan; Rodgers was removed because COSMO failed to request counseling in a timely manner.  However, plaintiff offers substantial contradictory evidence, which has already been recounted.  I point out here only a portion of what was previously discussed.

---

[26]  Curiously, neither side introduced evidence addressing NSA's removal procedures and, in particular, whether or when NSA suspends or reverses a removal decision.

As indicated, Sager testified that he learned of Eagle's proposed removal of Rodgers by way of an email from Amanda Hines at 2:47 p.m. on August 4, 2016.  ECF 54-3 (Sager Dep.) at 17-18 (Tr. at 25-26); *see* ECF 54-8 at 3-4 (the Hines email).  In response, Sager promptly called Bryant to discuss the issue.  ECF 54-3 at 19 (Tr. at 27).  In this conversation, Sager claims he expressly requested "an opportunity for [COSMO] to counsel Ms. Rogers [sic] and provide her an opportunity for corrective action."  *Id.* at 19-20 (Tr. at 27-28).  Shortly thereafter, and consistent with Sager's account, Hines sent a second email to COSMO at 3:25 p.m. on August 4, 2016, stating that Rodgers's termination had been "put on hold . . . ."  ECF 54-8 at 3; ECF 54-3 at 20 (Tr. at 28).

Then, at 10:05 a.m. on August 5, 2016, Sager sent an email to several colleagues at COSMO, indicating that Bryant was unwilling to reconsider his request for counseling.  ECF 54-3 (Sager Dep.) at 22 (Tr. at 30).  Sager's choice of the word "reconsidered" is significant.  *See* ECF 54-8 at 2 ("I was hoping that they reconsidered the decision . . . .").  It supports Sager's claim that he had previously made a request for counseling but it was rejected.  *See* ECF 54-3 (Sager Dep.) at  19-23 (Tr. at 27-31).  And, EA then declined to reconsider its original decision.

Bryant explained to Sager that Lopez was "adamant about removing [plaintiff] from his team."  *Id.* at 22 (Tr. at 30). A jury could readily find that the email supports Sager's claim that his timely request for counseling was rejected, not because it was untimely, but rather because Lopez was unwilling to retain plaintiff.  Indeed, a factfinder could readily conclude that this was the reason that Bryant and Miller declined to afford plaintiff the opportunity for counseling, and that the claim that Sager's request was untimely was untrue.

The EA Defendants urge the Court to nonetheless consider the circumstances presented by another male subcontractor, Gary Weir.  ECF 53-1 at 26-27.  With respect to Weir, the EA Defendants point out that he was removed from the Groundbreaker contract in May 2016, without

the opportunity for counseling.  *Id.*; *see* ECF 53-6 (Bryant Dep.) at 35 (Tr. at 127); *see also* ECF 53-7 (Sager Dep.) at 11-12 (Tr. at 59-60) (indicating that COSMO had no opportunity to counsel Weir before his removal from the Groundbreaker contract).  Accordingly, the EA Defendants conclude that Rodgers "received *the exact same* treatment as Mr. Weir," and thus plaintiff's "sex discrimination claim is without merit."  ECF 53-1 at 27.

But, Weir is not necessarily an appropriate comparator.  Although comparators "need not be identical, the plaintiff and the comparator must be 'similar in all relevant respects,' such as whether the employees had the same supervisor, were subject to the same standards, and did not have 'such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Stovall v. H&S Bakery*, TDC-20-3234, 2021 WL 2580746, at *5 (D. Md. Jun. 23, 2021) (quoting *Kelley v. United Parcel Serv., Inc.*, 528 F. App'x 285, 286 (4th Cir. 2013) (per curiam)).

Notably, Bryant testified that Weir was removed because he was "very junior" and did not have the appropriate skill set to succeed.  ECF 53-6 (Bryant Dep.) at 36 (Tr. at 128).  Further, because Weir was removed in May 2016, his removal could not have been predicated on unsatisfactory report card metrics.  *See* ECF 53-10 (Juarez Decl.), ⁋ 19 (stating that the report card system was implemented in June 2016).  Moreover, the defense's own evidence indicated that Weir's deficiencies would not have been cured by a two-week period of counseling, because Weir lacked the skills needed for the Groundbreaker contract.  And, Weir was "rehired" by EA in September 2018, after he acquired additional skills from working on another contract for a period of some years.  ECF 53-6 at 36-37 (Tr. at 128-29).[27]

---

[27] Bryant testified that Weir was "rehired" by EA to work on the Groundbreaker contract.  ECF 53-6 (Bryant Dep.) at 36 (Tr. at 128).  But, it is not clear whether EA hired Weir as an EA employee or approved his assignment to work as a subcontractor.  The parties' exhibits do not

Defendants also point out that another male subcontractor, Charles Belew, was removed from Groundbreaker without counseling. ECF 53-13 at 3 (Email from Juarez to Miller requesting removal of Belew from Groundbreaker). But, according to Bryant's deposition testimony, when she discussed Belew's proposed removal with his company, the employer did not request counseling. ECF 53-6 (Bryant Dep.) at 18 (Tr. at 91). In contrast, Sager testified that Eagle pursued Rodgers's removal from the Groundbreaker contract despite Sager's prompt request for counseling for Rodgers.

As mentioned, when Lopez requested Rodgers's removal from the Groundbreaker contract, he also requested the removal of a male worker named Carl Bonds. ECF 53-13 at 3. However, the EA Defendants do not argue that Bonds is an appropriate comparator, presumably because Bonds was an EA employee, not a subcontractor. *Id.* And, the process for removing an Eagle employee was different from the process for removing a subcontractor. As Miller testified, in the event Eagle wanted to remove an Eagle employee, EA management "would have to regularly counsel [the employee]," "document" the issue "with HR," and "write up what the performance concerns were, what the actionable goals were for them to meet, a time frame." ECF 53-11 at 6 (Tr. at 20). And, as set forth above, when Eagle wanted to remove a subcontractor, EA would merely "go to Terry Bryant to . . . request removal," and she "would handle it from there and talk to the [subcontractor's direct employer]." *Id.* at 7 (Tr. at 21).

In sum, there are material, disputed facts as to whether plaintiff was treated differently from similarly situated male subcontractors. Thus, for purposes of resolving the Motion, plaintiff has satisfied the disparate treatment element of a prima facie claim for sex discrimination.

---

shed light on the issue. *Cf.* ECF 54-3 (Sager Dep.) at 35-37 (Tr. at 59, 62-63) (discussing Weir's removal from the Groundbreaker contract).

## 2. Job Performance

As mentioned, to establish the satisfactory performance element of a prima facie case of sex discrimination, the plaintiff must show that she was "performing her job duties at a level that met her employer's legitimate expectations *at the time of the adverse employment action* . . . ." *Hill*, 354 F.3d at 285 (emphasis added). There are material facts in dispute as to whether plaintiff's performance met the legitimate expectations of her employer at the relevant time.

The plaintiff need not "show that [s]he was a perfect or model employee. Rather, a plaintiff must show only that [s]he was qualified for the job and that [s]he was meeting [her] employer's legitimate expectations." *Haynes*, 922 F.3d at 225. Moreover, a plaintiff may introduce "evidence that demonstrates (or at least creates a question of fact) that the proffered 'expectation' is not, in fact, legitimate at all." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 517 (4th Cir. 2006).

Generally, in evaluating whether a plaintiff has met the legitimate expectations of her employer, "'[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'" *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003) (quoting *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996), *cert. denied,* 540 U.S. 1073 (2003)). *See*, *e.g.*, *Hill v. Southeastern Freight Lines, Inc.*, 523 F. App'x 213, 216 (4th Cir. 2013) (per curiam); *Johnson v. Mechanics & Farmers Bank*, 309 F. App'x 675, 683 (4th Cir. 2009) (per curiam); *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 363 (4th Cir. 2005) (per curiam). But, in *Sempowich*, 19 F.4th at 650, the Fourth Circuit said: "[A]lthough we have held that we must focus on the employer's perception in the context of the *pretext* stage, we have not so held with respect to a plaintiff's prima facie case." (Citations omitted) (italics in *Sempowich*).

Relying on report cards for June and July of 2016, the EA Defendants presented evidence that plaintiff had attendance issues and failed to complete the minimum number of tasks expected

of her.  As Juarez explained in his Declaration, he established an expectation that, among other things, all Help Desk employees, including plaintiff, were to arrive at their shifts on time, have a not-ready percentage of less than 12.5%, and complete a minimum of 10 tasks per shift.  ECF 53-10, (Juarez Decl.) ¶¶ 13, 16-17.  Rodgers's report cards reveal that she fell short on all three fronts during the months of June and July of 2016.  ECF 53-12 at 3, 6.   Further, the EA Defendants presented evidence showing that Lopez was dissatisfied with Rodgers's "productivity and general attitude," including that plaintiff declined numerous opportunities for additional training, required close supervision, did not respond to emails from management, and could not be trusted to complete important tasks without follow-up.  ECF 53-13 at 2 (Email from Lopez to Miller requesting Rodgers's removal).

Rodgers disputes the EA Defendants' position.  First, she points out that she had received salary increases while working on the Groundbreaker contract, which establishes that she was meeting Eagle's performance expectations.  ECF 54 at 19.  Further, she contends that, to the extent she was not meeting EA's performance expectations, these expectations were not legitimate.   To that end, she points out that: (1) the report card system was not an accurate measure of her productivity; (2) other subcontractors exhibited worse performance deficiencies and were not removed; (3) she was not made aware of any concerns regarding her performance until mere weeks before her removal.  *Id.* at 19-21.

The evidence shows that Rodgers received two salary increases while she was working on the EA contract.  *Id.* at 19; *see* ECF 54-11 (Salary Recommendation Forms).  But, she was awarded those raises in August 2014 and August 2015, respectively.  *See* ECF 54-11 at 3-4.  In other words, Rodgers's raises were provided to her more than six months before the report card system was instituted.  *See* ECF 53-10 (Juarez Decl.), ¶¶ 6, 19-20.  And, Lopez's request to remove Rodgers

from Groundbreaker was predicated on the data collected pertaining to Rodgers's performance in June and July 2016, almost a year after COSMO gave plaintiff her last raise. *See* ECF 53-13 at 2 (Email from Lopez to Miller describing Rodgers's performance issues in June and July 2016 as reflected in her report cards).

In my view, a salary increase awarded nearly one year before the removal does little, if anything, to show that plaintiff was performing to the satisfaction of the EA Defendants at the time of her removal. *Cf. Sempowich*, 19 F.4th at 650-51 (finding that an employer's offer to award a salary increase within weeks of an adverse employment action helped to show that plaintiff was performing job functions at a satisfactory level, so as to establish a prima facie case of sex discrimination).

As to plaintiff's claim concerning the legitimacy of EA's expectations, plaintiff first maintains that the report cards did not provide meaningful information because they did not distinguish between employees who were one minute late and one hour late. ECF 54 at 19; *see* ECF 54-5 (Bryant Dep.) at 12, 13 (Tr. at 69, 73). Further, she argues that she experienced consistent technical issues with her equipment, which contributed to her difficulty in meeting the EA Defendants' expectations. ECF 54 at 19; *see* ECF 54-7 (Rodgers Dep.) at 22 (Tr. at 136); ECF 54-13 (Tickets Submitted). Plaintiff also notes that there were times that she "could not go directly to her seat or log in but had to go straight to the conference room for meetings," which would have "affected her start time and not-ready time." ECF 54 at 20; *see* ECF 54-7 (Rodgers Dep.) at 32-33 (Tr. at 163-64).

But, Rodgers's complaints pertaining to the equity of the report card system are inapposite. Simply put, the Court "do[es] not sit as 'a super-personnel department weighing the prudence of employment decisions'" made by employers. *Anderson v. Westinghouse Savannah River Co.*, 406

F.3d 248, 272 (4th Cir. 2005) (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).

Moreover, the EA Defendants introduced evidence showing that punctuality was a critically important aspect of plaintiff's work.  In particular, the undisputed evidence shows that in early 2016, Eagle Alliance won a new contract that broadened its scope of work.  *See* ECF 53-4 (Miller Decl.), ¶¶ 9-11.  Thereafter, EA management set a goal to take a "look at a very granular level" at "productivity," so as to determine when it was "not keeping up," and it adopted the position that "lateness . . . couldn't be tolerated."  ECF 53-11 (Miller Dep.) at 10 (Tr. at 29).

To that end, when Juarez assumed a supervisory role within Eagle, he was tasked with improving the overall productivity of the Help Desk team.  *See* ECF 53-10 (Juarez Decl.), ¶¶ 6-8. He instituted the report card system to track each Help Desk Technician's "punctuality, productivity, and overall performance."  *Id.* ¶ 9.  Further, as described above, the EA Defendants presented evidence showing that, in their view, plaintiff failed to measure up against their chosen metrics.  *See* ECF 53-12 at 3, 6; ECF 53-13 at 2.

Plaintiff also argues that, even if she did not meet Eagle's expectations as set forth in the report card, the expectations were not legitimate, because other subcontractors, with deficient performance records, were allowed to continue working on the Groundbreaker contract.  ECF 54 at 20-21.  As discussed earlier, the evidence shows that two male subcontractors, Morgan and Johnson, performed poorly against Eagle's metrics and, in some material respects, worse  than plaintiff.  *See* ECF 53-12 (report cards showing that Rodgers maintained a minimum productivity percentage that was roughly twice as high as the minimum productivity percentage of Johnson and Morgan); ECF 54-5 (Bryant Dep.) at 17 (Tr. at 94) (describing the results outlined in the report cards).

However, evidence of a peer's poor performance does not establish that an employer's expectation was illegitimate or that plaintiff was performing satisfactorily. The Fourth Circuit's decision in *King*, 328 F.3d 145, provides guidance. In that case, the district court granted summary judgment to the employer because plaintiff's "proffer . . . did not contain evidence that [plaintiff's] job performance was satisfactory at the time of his discharge." *Id.* at 148. The Fourth Circuit (Luttig, J.) affirmed, finding that plaintiff failed to establish that he met his employer's legitimate performance expectations. *Id.* at 149-50.

In the portion of its analysis that is relevant here, the *King* Court determined that the testimony of plaintiff's coworkers that their work product was similar to that of the plaintiff was not persuasive because such evidence "is *no* proof that [plaintiff's] performance met appellee's legitimate job performance expectations." *King*, 328 F.3d at 149 (emphasis in *King*). According to the *King* Court, such evidence, "taken as fully accurate, might simply reflect that their job performance too was lacking." *Id.* at 149 n.3.

In light of *King*, 328 F.3d 145, the mere fact that other subcontractors failed to perform satisfactorily but were not removed from the Groundbreaker contract does not show that Rodgers met the EA Defendants' expectations. *Id.* at 150. Rather, as observed by the *King* Court, such evidence, even taken as true, may only be probative of the fact that other employees were also failing to meet the EA Defendants' expectations. *See Carr v. Md. Grocery Store Co.*, GLR-17-244, 2019 WL 1427779, at *7 (D. Md. Mar. 29, 2019) ("'That other employees engaged in misconduct while on the job, but were not terminated, is not evidence that [the plaintiff] met [her employer's] expectations.'") (quoting *Johnson v. Merchs. Terminal Corp.*, ELH-16-838, 2017 WL 1546429, at *13 (D. Md. Apr. 27, 2017)); *Williams v. TWC Admin. LLC*, 3:16-cv-3902-CMC-KDW, 2018 WL 7204074, at *7 (D.S.C. Nov. 29, 2018) ("Actions of others may be considered in

evaluating whether Plaintiff has presented evidence of valid comparators, but it is not relevant to whether Plaintiff was satisfactorily performing her duties.") (emphasis omitted); *but cf. Warch*, 435 F.3d at 515-16 (noting the "danger" of applying the "expectations" element of the prima facie case too strictly "where there is . . . one event that sparked the termination" as opposed to cases involving a "long string of performance problems leading up to the firing.")

Nonetheless, there is a genuine dispute of material fact as to whether the EA Defendants' expectations were legitimate. Based on the record, a jury could reject the EA Defendants' claim that plaintiff failed to meet Eagle's legitimate expectations.

As mentioned, an employer's expectations cannot be legitimate if they amount to no more than a "'sham designed to hide the employer's discriminatory purpose. *Warch*, 435 F.3d at 518 (quoting *Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742, 745 (7th Cir. 2002)). And, viewed in the light most favorable to the plaintiff, the evidence presented to the Court indicates that EA's expectations were not legitimate because Rodgers was unaware of the expectations concerning her performance.

Many courts have said that the employee's awareness of her employer's expectation is a relevant factor in evaluating whether the employer's expectation was legitimate. Moreover, "an employer cannot expect—not legitimately nor reasonably—that its employees will meet a policy it has not made clear." *Caban v. MET Laboratories, Inc.*, JKB-17-1872, 2019 WL 2146915, at *10 (D. Md. May 16, 2019). *See, e.g.*, *Warch*, 435 F.3d at 517 (noting that employer expectations were legitimate in light of the number of warnings that employee received with respect to his performance); *Cooper v. Micros Systems, Inc.*, CCB-14-1373, 2015 WL 6549093, at *3 (D. Md. Oct. 27, 2015) (explaining that where "'an employee is aware of an employer's policy and violates it, [the employee] has not met the employer's legitimate expectations'") (quoting *Jones v. Dole*

*Food Co.*, 827 F. Supp. 2d 532, 547 (W.D.N.C. 2011), *aff'd*, 473 F. App'x 270 (4th Cir. 2012) (per curiam)); *Farasat v. Paulikas*, 32 F. Supp. 2d 249, 255 (D. Md. 1998) (explaining that plaintiff did not meet the employer's legitimate expectations where, despite "warnings and counselling," he was repeatedly late to work); *Afande v. Nat'l Lutheran Home for the Aged*, 868 F. Supp. 795, 801 (D. Md. 1994) (finding that plaintiff had failed to make a prima facie case of discriminatory treatment where, after multiple warnings, she was terminated for excessive absences), *aff'd*, 69 F.3d 532 (4th Cir. 1995).

As an initial matter, Juarez appears to claim that he "noticed" that plaintiff was failing to meet expectations as early as April 2016. ECF 53-10 (Juarez Decl.), ⁋ 20. But, the EA Defendants have not offered any evidence to support this assertion. In April and May 2016, plaintiff was working offsite. ECF 54-7 (Rodgers Dep.) at 19 (Tr. at 127). Moreover, this was two months before EA "implement[ed] the report card system." ECF 53-10, ⁋ 19. Indeed, in Lopez's email to Miller requesting Rodgers's removal, Lopez said: "Since the month of May, Mids technicians have been expected to complete a minimum of 10 tasks per shift. The month of May was provided as a transition period so tasks completion was not being watched closely however June and July have been." ECF 53-13 at 2.

The evidence is also hotly disputed as to whether Rodgers was made aware of Juarez's expectations concerning her performance. As mentioned, Rodgers claims that around the same time that Juarez assumed a supervisory role on the Groundbreaker contract, she was transferred to work at an NSA facility for a two-month period. ECF 54-7 (Rodgers Dep.) at 18, 19 (Tr. at 125, 127). As a result, she asserts that she was excluded from "team meetings, group discussions," and "trainings" that occurred at the Eagle facility. *Id.* at 19 (Tr. at 127). Moreover, Rodgers avers that she repeatedly requested meetings with Juarez to discuss the subject of these team meetings, yet

Juarez failed to meet with plaintiff, stating: "'Oh, when I get a chance.  I'm really busy' . . . ."  *Id.*  Notably, Juarez designed and implemented the report card system around this same time.  ECF 53-6 (Bryant Dep.) at 8-9 (Tr. at 12-13); ECF 53-10 (Juarez Decl.), ₽₽ 6, 19.

And, Rodgers stated that she remained wholly unaware of any concerns that Juarez harbored with respect to her productivity or punctuality until she met Juarez at some unspecified time in July 2016.  ECF 54-7 (Rodgers Dep.) at 28-31 (Tr. at 159-62);  ECF 54-12 (Rodgers Decl.), ₽ 8.  In this conversation, Juarez discussed only his concerns with plaintiff's punctuality, stating: "'I did notice that you've been coming in like one minute late'. . . ."  ECF 54-7 (Rodgers Dep.) at 29 (Tr. at 160).  Juarez instructed plaintiff to arrive fifteen to twenty minutes before the beginning of her shift to ensure that there would be "'no problems.'"  *Id.*  Yet, aside from attendance issues, he stated that plaintiff's work was "'fine.'"  *Id.* at 29, 33 (Tr. at 160, 164).  Indeed, plaintiff claims that Juarez told her he had no complaints about the quality of her work.  *Id.* at 33 (Tr. at 164).  Moreover, Rodgers indicated that Juarez "never told [her] that there was a 12.5% maximum not ready time . . . ."  ECF 54-12 (Rodgers Decl.), ₽ 12.

Rodgers also offered undisputed testimony showing that when she worked under her former supervisors, she was given a fifteen to twenty minute grace period to arrive for her scheduled shift.  ECF 54-7 (Rodgers Dep.) at 30-31 (Tr. at 161-62).  She explained that her previous supervisors "'didn't start the clock and presume you [were] late until . . . 15, 20 minutes into [a] shift . . . .'"  *Id.* at 31 (Tr. at 162).  It is not apparent how, in the absence of a superseding directive, Rodgers could have been aware that the grace period was no longer available.

In any event, plaintiff improved her punctuality considerably after she met with Juarez.  Indeed, plaintiff's report card for July 2016 reflects that she was late to her shift on only a handful of occasions, all of which occurred within the first third of the month.  *See* ECF 53-12 at 3, 6

(showing plaintiff was late 14 times in June 2016) and 3 times in July 2016).  Yet, Lopez asked for plaintiff's removal on August 1, 2016.  ECF 53-13 at 1, 2.

Sager's testimony is also quite significant.  He said that, in plaintiff's three years at EA, he was never told of any issue with Rodgers's performance.  Sager wrote in an email to Bryant on August 5, 2016:  "[T]his is the first time in her 3 years on GB [*i.e.*, Groundbreaker] that we have heard of concerns about [Rodgers's] performance . . . ."  ECF 54-14 at 2.

The EA Defendants do not dispute plaintiff's testimony so much as they dance around it.  Juarez averred that he "explained each of [his] expectations to all Help Desk Technicians."  ECF 53-10 (Juarez Decl.), ¶ 18.  And, he stated: "Although I assumed responsibility for the Help Desk in April 2016, I did not implement the report card system until June 2016 to give everyone an opportunity to improve their performance."  *Id.* ¶ 19.  Yet, plaintiff was not on site at EA until the end of May of 2016.  ECF 54-7 (Rodgers Dep.) at 19 (Tr. at 127).  And, the report card system began in June 2016.  Juarez does not establish the timing at which he made plaintiff aware of his expectations.

In sum, Rodgers has presented genuine disputes of material fact as to a prima facie case for sex discrimination.  A reasonable jury could conclude that, to the extent plaintiff failed to meet the EA Defendants' job expectations, those expectations were not legitimate.

### 3.  Non-Discriminatory Reason/Pretext

As mentioned, under *McDonnell Douglas*, an employer may rebut the prima facie case of discrimination by providing a legitimate, non-discriminatory reason for the employment action. If the defendant produces, "through the introduction of admissible evidence," legitimate, non-discriminatory reasons for its disputed employment action, "the presumption raised by the prima facie case is rebutted" and "drops from the case."  *Burdine*, 450 U.S. at 255. Specifically, in

discriminatory discipline cases, the defendant must articulate "a non-discriminatory reason or the difference in disciplinary enforcement." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993).

In assessing the defendant's proffered reasons, the Fourth Circuit has "repeatedly observed" that it is not a court's "'province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211 (4th Cir. 2014) (alterations omitted) (quoting *DeJarnette,* 133 F.3d at 299). When the question at issue is whether the decisionmaker acted with discriminatory animus, only the "perception of the decision maker" is "relevant to the question." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 319 (4th Cir. 2006) (citations omitted).   Thus, "the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." *Id.* at 315.

The EA Defendants contend that they have offered a legitimate reason for Rodgers's removal: "her poor attendance and low productivity as reflected in the report cards." ECF 53-1 at 34.   To be sure, an employee's poor performance can serve as a nondiscriminatory reason for an adverse employment action.   *See Richardson v. Univ. of Md. Shore Regional Health, Inc.*, SAG-21-669, 2021 WL 6064852, at *8 (D. Md. Dec. 22, 2021);   *Caban*, 2019 WL 2146915, at *13; *Ambrose v. Prince George's Cnty. Public Schools*, TDC-16-2998, 2018 WL 1353001, at *6 (D. Md. Mar. 14, 2018).   However, plaintiff has presented evidence that calls into question whether her performance fell below the legitimate expectations of the EA Defendants.   For example, Juarez told Rodgers that she was doing "'fine'" within a month of seeking her removal.   ECF 54-7 at 29, 33 (Tr. at 160, 164).   Moreover, Sager testified that in plaintiff's three years at Eagle, he was never

informed of any issues with her work.   *See* ECF 54-3 (Sager Dep.) at 20 (Tr. at 28); *see also* ECF 54-14 at 2.

As noted, once the defendant has articulated a non-discriminatory reason for the employment action, the plaintiff must then "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253.   To show pretext, a plaintiff must proffer sufficient evidence such that a reasonable trier of fact could conclude that the employer's explanation is false or "'unworthy of credence,'" *Mereish v. Walker,* 359 F.3d 330, 336 (4th Cir. 2004) (quoting *Burdine,* 450 U.S. at 256), and that discrimination or retaliation was the true reason for the adverse employment action.   *St. Mary's Honor Center*, 509 U.S. at 515 (plaintiff must prove "*both* that the reason was false, *and* that discrimination was the real reason"); *accord Adams v. Trustees of Univ. of North Carolina–Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011).

The same evidence that plaintiff put forward in support of her prima facie case can be employed to show pretext.   *See Warch*, 435 F.3d at 516 ("[W]e find no impermeable barrier that prevents the [parties'] use of such evidence at different stages of the *McDonnell Douglas* framework."). Notably an employer's failure to "follow established procedures for handling perceived deficiencies in the performance of its employees" can cut against its proffered nondiscriminatory justification for an adverse employment action.   *Hamilton v. 1st Source Bank*, 895 F.2d 159, 162 (4th Cir. 1990), *aff'd in part, rev'd in part, and remanded on other grounds*, 928 F.2d 159 (4th Cir. 1990) (en banc); *see Doe v. Morgan State Univ.*, 544 F. Supp. 3d 563, 571 (D. Md. 2021) ("'[E]vidence indicating that [defendant] failed to follow established procedures helps [plaintiff] to raise a genuine dispute over whether [defendant's] reasons for his discharge

were pretextual'") (alteration in *Doe*) (quoting *Stiles v. General Elec. Co.*, 986 F.2d 1415, at *4 (4th Cir. Feb. 12, 1993) (per curiam)).

As to pretext, a jury could consider that, in plaintiff's three years at EA, COSMO was never advised of a performance issue. *See* ECF 54-3 at 20 (Tr. at 28); ECF 54-14 at 2.  And, a jury could consider that plaintiff was not on site at EA until the end of May 2016, and the report card system only began in June 2016.  *See* ECF 54-7 at 19 (Tr. at 127) (explaining the timeframe when Rodgers was assigned to work at the NSA facility); ECF 53-10 (Juarez Decl.), ¶ 19 (reflecting that Juarez "did not implement the report card system until June 2016 . . . .").  Rodgers also claimed that she did not have the training that those on site had received.  ECF 54-7 at 19 (Tr. at 127).  And, the report cards only covered a two-month period.  *See* ECF 53-12.

Rodgers also presented evidence that she was treated differently from two similarly situated male subcontractors.  In particular, plaintiff's evidence demonstrates that EA permitted similarly situated male subcontractors to undergo counseling and retain their positions.  *See* ECF 54-5 (Bryant Dep.) at 17, 18-22 (Tr. at 94, 101-02, 104-06).  And, a jury could readily reject the EA Defendants' proffered justification for the different treatment between Rodgers and her male colleagues (*i.e.* that Sager did not timely request counseling for plaintiff), for the reasons already stated.  *See* ECF 54-3 (Sager Dep.) at 17-20 (Tr. at 25-28).

Moreover, the EEOC found that, in light of the fact that Eagle "decided to remove [Rodgers] from the job and only gave Mr. Morgan and Mr. Johnson two-week probations," there was reasonable cause to believe that Rodgers's removal amounted to sex discrimination. ECF 54-25 at 2; *see Smith v. Universal Servs., Inc.*, 454 F.2d 154, 157 (5th Cir. 1972) ("The fact that an investigator, trained and experienced in the area of discriminatory practices and the various

methods by which they can be secreted, has found that it is likely that such an unlawful practice has occurred, is highly probative of the ultimate issue involved in such cases.")

Based on plaintiff's testimony that she was not given sufficient notice of the EA Defendants' expectations concerning her performance; an Eagle manager expressly told plaintiff that her productivity was satisfactory within a month of her removal; and COSMO had never been told of any performance issue concerning plaintiff in the three years that plaintiff worked for Eagle, I am persuaded that plaintiff has generated a genuine dispute as to whether the EA Defendants' proffered nondiscriminatory reason for plaintiff's removal from the Groundbreaker contract was merely pretextual.

In a last ditch effort, the EA Defendants maintain that they are entitled to a presumption that plaintiff's removal was not discriminatory, because the ultimate decisionmaker, Miller, is a member of the same protected class as plaintiff.  ECF 53-1 at 28-29.  The Fourth Circuit has said that such circumstances "'do not preclude a successful discrimination claim, [but they] substantially weaken[ ] any inference of discrimination.'"  *Orgain v. City of Salisbury*, 305 F. App'x 90, 103 (4th Cir. 2008) (per curiam) (quoting *Neely v. United States Postal Serv.*, No. 03-6566, 2007 WL 4389473, at *8 n.4 (E.D. Pa. Dec. 12, 2007)).

But, it does not necessarily follow that such an inference is available where, like here, the proffered evidence establishes a genuine dispute of material fact as to whether plaintiff was subjected to disparate treatment in connection with an adverse employment action.  Indeed, as Rodgers points out (ECF 54 at 25), the Supreme Court has squarely rejected this logic, explaining: "Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of that group."  *Castaneda v. Partida*, 430 U.S. 482, 499 (1997).

Accordingly, I shall deny EA's summary judgment as to Count 1.

### E.  Count 2: Retaliation

### 1. Retaliation Generally

In addition to its antidiscrimination protections, Title VII contains protections against retaliation by an employer against an employee for engaging in certain kinds of protected activity.

The Fourth Circuit has made clear that the *McDonell Douglas* proof scheme applies to a retaliation claim. *See, e.g.*, *CSRA*, *Inc.*, 12 F.4th at 416.  Thus, "[a] plaintiff may prove that an employer took action with discriminatory or retaliatory intent through direct evidence or through the [*McDonnell Douglas*] burden-shifting framework." *Strothers*, 895 F.3d at 327 (citing *Foster v. Univ. of Md.–E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015)).

To state a prima facie claim of retaliation, a plaintiff must establish "'that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC; (2) the employer acted adversely against the plaintiff; and (3) the protected activity was causally connected to the employer's adverse action.'" *Okoli v. City of Balt.*, 648 F.3d 216, 223 (4th Cir. 2011) (citation omitted); *see Sempowich*, 19 F.4th at 653; *Roberts*, 998 F.3d at 122; *Kitlinski*, 994 F.3d at 232; *Strothers*, 895 F.3d at 327; *Guessous*, 828 F.3d at 217; *Smyth-Riding v. Sci. Eng'g Servs., LLC*, 699 F. App'x 146, 151 (4th Cir. 2017); *Foster*, 787 F.3d at 250; *Jacobs*, 780 F.3d at 578.

The Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005); *see Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an

employee for opposing discriminatory practices in the workplace." *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998); *see* 42 U.S.C. § 2000e-3(a).

"Protected activity under Title VII includes complaints of discrimination based upon 'race, color, religion, sex or national origin.'" *Landino v. Sapp*, 520 F. App'x 195, 198 (4th Cir. 2013) (per curiam) (citation omitted).   And, "[c]omplaints raised through internal company procedures are recognized as protected activity." *Roberts*, 998 F.3d at 122.  As the Fourth Circuit has said, "[t]o fall under the protection of the opposition clause . . . behavior need not rise to the level of formal charges of discrimination.  The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981) (citation omitted); *see Laughlin*, 149 F.3d at 259 ("Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.")  But, "for an employee's activity to constitute protected 'opposition,' she must show (1) that she reasonably believed that the employment action she opposed constituted a Title VII violation, and (2) that her conduct in opposition was reasonable." *Netter*, 908 F.3d at 937-38.

The second element is that of an "adverse action."  An adverse employment action is one that adversely affects the terms, conditions, or benefits of employment.  *Roberts*, 998 F.3d at 122. However, in *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case.  (Emphasis added.)  In other words, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.*; *see also Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to

discriminatory actions that affect the terms and conditions of employment."). Thus, "[t]he scope of Title VII's anti-retaliation provision . . . is broader than the anti-discrimination provision." *Strothers*, 895 F.3d at 327.

Nevertheless, there must be "some direct or indirect impact on an individual's employment . . . ." *Adams*, 789 F.3d at 431. So, "retaliatory actions do have to be 'materially adverse'—such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers*, 895 F.3d at 327 (quoting *Burlington Northern*, 548 U.S. at 68).

Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67; *see also Ray v. Int'l Paper Co.*, 909 F.3d 661, 667 (4th Cir. 2018). In other words, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68). Nor does "a personal conflict alone . . . constitute retaliation." *Spencer v. Va. State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019). But, "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion" constitute adverse actions. *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).

To establish causation under Title VII, the plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360; *see also Irani v. Palmetto Health*, 767 F. App'x 399, 421 (4th Cir. 2019) (per curiam). The plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter*, 908 F.3d at 938; *see Foster*, 787 F.3d at 249. This requirement of but-for causation imposes a higher

burden on a plaintiff than the mixed-motive requirement in Title VII's antidiscrimination provision. *See Foster*, 787 F.3d at 249-50.

Nevertheless, "establishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers*, 895 F.3d at 335; *CSRA, Inc.*, 12 F.4th at 417. Indeed, "[v]ery little evidence of a causal connection is required to establish a *prima facie* case of retaliation." *Roberts*, 998 F.3d at 127 (quotation marks and citation omitted); *see CSRA, Inc.*, 12 F.4th at 417. As the Fourth Circuit explained in *Foster*, 787 F.3d at 250-52, "*Nassar* [did] not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim," because it did not require establishing but-for causation at the prima facie stage, and but-for causation is already required at the pretext stage.

"A plaintiff may attempt to demonstrate that a protected activity caused an adverse action [at the prima facie stage] 'through two routes.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson v. U.S. Postal Servs., Inc.*, 839 F. App'x 781, 783-84 (4th Cir. 2021) (per curiam)); *see CSRA, Inc.*, 12 F.4th at 417. "A plaintiff may establish the existence of facts that 'suggest[ ] that the adverse action occurred because of the protected activity.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson*, 839 F. App'x at 783-84; *see Lettieri*, 478 F.3d at 650 (recognizing that relevant evidence may be used to establish causation)). Or, a plaintiff may demonstrate that "the adverse act bears sufficient temporal proximity to the protected activity." *Johnson*, 839 F. App'x at 784 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001)). And, "[t]he existence of relevant facts alone, or together with temporal proximity, may be used to establish a causal connection between the protected activity and the adverse action." *Roberts*, 998 F.3d at 123.

To be sure, "temporal proximity suffices to show a causal relationship." *Sempowich*, 19 F.4th at 654. In *Strothers*, 895 F.3d at 335-36, the Court said: "An employee may establish *prima facie* causation simply by showing that (1) the employer either understood or should have

understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *See also Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) ("In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity."  (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

For the temporal route, there naturally must exist "some degree of temporal proximity to suggest a causal connection." *Constantine*, 411 F.3d at 501. Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted).  And, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King*, 328 F.3d at 151 n. 5).  Moreover, "'[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints").

But, as indicated, temporal proximity is not the sole avenue to show causation. *CSRA*, *Inc.*, 12 F. 4th at 417.  Rather, temporal proximity is one of two paths.  The other path contemplates

"the existence of facts indicative of an adverse action 'because of the protected activity.'" *Roberts*, 998 F.3d at 123 (citation omitted).

Of import here, the Fourth Circuit has made clear that in a Title VII retaliation case, to establish a causal relationship between the protected activity and adverse action, "a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Roberts*, 998 F.3d at 124; *see Dowe*, 145 F.3d 657.  As a result, if the "decisionmaker is unaware of any prior complaints, a plaintiff 'cannot establish the necessary causal connection'. . . ." *Roberts*, 998 F.3d at 124.  And, constructive knowledge is not sufficient.  *Id.* at 125.  Rather, actual knowledge is required.  *Id.*

## 2. Analysis

The Motion assumes that plaintiff's retaliation claim is predicated on two alleged instances of protected conduct: (1) Michaels's complaint to Miller about Lopez's treatment of plaintiff; and (2) plaintiff's charge of sex discrimination.  ECF 53-1 at 30-32.

As an initial matter, it is not obvious to the Court that Count 2 includes a claim that the EA Defendants retaliated against plaintiff based on Michaels' complaint.  *See* ECF 13, ¶¶ 43-46.  But, to the extent that Count 2 includes such an assertion, it cannot survive the Motion because plaintiff has not responded in the Opposition to the EA Defendants' argument for summary judgment on this ground.  Plaintiff makes no argument in the Opposition pertaining to Michaels's complaint concerning Lopez's behavior.  Indeed, the portion of the Opposition devoted to plaintiff's retaliation claim focuses exclusively on how the EA Defendants retaliated against plaintiff for the charge of sex discrimination that she filed with the EEOC.  *See* ECF 54 at 25-28.

A plaintiff who fails to respond to an argument for summary judgment is deemed to have abandoned the claim.  *See Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 783

(D. Md. 2010)); *see also Mentch v. E. Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (explaining that plaintiff's failure to address an argument raised in defendant's opening brief constitutes abandonment of the challenged claim). Thus, to the extent that Count 2 includes an argument that the EA Defendants retaliated against plaintiff because of Michaels' complaint against Lopez, the argument is abandoned. *See Grant-Fletcher v. McMullen & Drury, P.A.*, 964 F. Supp. 2d 514, 525 (D. Md. 2013) (granting that summary judgment on claim where plaintiff failed to respond to defendant's argument in opening brief).

It is undisputed that filing a charge of discrimination with the EEOC is protected activity within the meaning of Title VII. And, the EA Defendants do not dispute that their refusal to interview Rodgers for positions on the Groundbreaker and ESOC contracts amounts to an adverse action. But, the Motion contends that plaintiff's claim for retaliation must fail because plaintiff has not established any causal connection between her protected activity and the adverse employment action. ECF 53-1 at 33.

"Establishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers*, 895 F.3d at 335; *see CSRA, Inc.*, 12 F.4th at 417. Indeed, "[v]ery little evidence of a causal connection is required to establish a prima case of retaliation." *Roberts*, 998 F.3d at 127 (quotation marks and citation omitted). But, as mentioned, the plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred." *Id.* at 124; *see CSRA, Inc.*, 12 F.4th at 419-420; *Dowe*, 145 F.3d at 657. In *Roberts*, 998 F.3d at 124, the Court emphasized that it has "consistently required proof of a decisionmaker's knowledge of protected activity to support a Title VII retaliation claim."

The EA Defendants argue that the evidence makes plain that the relevant decisionmakers were wholly unaware of plaintiff's charge of discrimination, or even that plaintiff intended to file

such a charge, at the time they refused to reassign plaintiff to a position on the Groundbreaker or ESOC contracts.  ECF 53-1 at 32-34.  To that end, they point out that the uncontroverted evidence establishes that Miller remained unaware of plaintiff's discrimination charge until January 2021.  *See* ECF 53-11 (Miller Dep.) at 19-20 (Tr. at 50-51).  Further, Juarez and Bryant were not apprised of plaintiff's charge until November 15, 2016, one week after Juarez refused to interview Rodgers and roughly three weeks after Sager told Rodgers that EA would not consider her for other positions on Groundbreaker.  ECF 53-9 (Bryant Decl.), ⁋ 17; ECF 53-10 (Juarez Decl.), ⁋ 31).[28]

Plaintiff insists that the Court should overlook this testimony because the "EEOC sent Ms. Rodgers' charge to Defendants on September 15, 2016."  ECF 54 at 27-28; *See* ECF 54-18.  Further, Rodgers advises that two additional notifications regarding plaintiff's charge were sent to defendants' attorney on October 14, 2016 and October 19, 2016.  ECF 54 at 28; *see* ECF 54-19.  In Rodgers's view, this order of events necessarily means that "Defendants had to have received the first notification in order to have provided the EEOC with the name of its attorney for the second and third notifications."  ECF 54 at 20.  And, she concludes that this refutes defendants' claim that Miller was not apprised of Rodgers's protected conduct until January 2021, and that Bryant, Lopez, and Juarez remained unaware of the charge until November 15, 2016.  *Id.*

The problem with plaintiff's argument is that it is at odds with clear Fourth Circuit precedent.  As indicated, the Fourth Circuit has said that "where a relevant decisionmaker is unaware of any prior complaints," a Title VII retaliation claim cannot survive because the plaintiff

---

[28] The EA Defendants also contend that Lopez learned of plaintiff's EEOC charge of sex discrimination on November 15, 2016.  *See* ECF 53-1 at 33.  But, they cite only to exhibits that establish the dates on which Bryant and Juarez learned of plaintiff's discrimination charge.  *Id.* at 33 n.173 (citing ECF 53-9 (Bryant Decl.); ECF 53-10 (Juarez Decl.)).  In any event, there is no evidence establishing that Lopez played any role in the EA Defendants' decision not to interview plaintiff for positions on the Groundbreaker or ESOC contracts.

"'cannot establish the necessary causal connection between [his] filing a complaint . . . [his] termination.'"  *Roberts*, 998 F.3d at 124 (quoting *Dowe*, 145 F.3d at 657) (alternations in *Roberts*). To be sure, regarding other species of Title VII claims, such as harassment, a plaintiff can establish a prima facie case by showing that an employer had constructive knowledge of the discriminatory conduct at issue.  *See Roberts*, 998 F.3d at 125 n.5 (citing *Strothers*, 895 F.3d at 335 (4th Cir. 2018); *Freeman v. Dal-Tile Corp.*, 750 F.3d at 423; *Howard v. Winter*, 446 F.3d 559, 567 (4th Cir. 2006); *Ocheltree v. Scollon Prod., Inc.*, 335 F.3d 325, 334 (4th Cir. 2003)).  However, as the *Roberts* Court explained, 998 F.3d at 125: "Fourth Circuit precedent addressing the causation prong of a *prima facie* case of retaliation requires that a plaintiff demonstrate that the decisionmaker imposing the adverse action have *actual knowledge* of the protected activity."  *Id.* (emphasis added).

And, in this case, plaintiff has not presented any evidence showing that a relevant decisionmaker had actual knowledge of plaintiff's protected conduct at the time that plaintiff suffered an adverse action.  As reflected in Sager's email to Rodgers, the EA "hiring manager" declined to interview Rodgers no later than October 17, 2016.  *See* ECF 54-20.[29]  Further, Juarez, the relevant decisionmaker with respect to plaintiff's application for a position on the ESOC contract, declined to interview Rodgers on November 8, 2016.  *See* ECF 53-10 (Juarez Decl.), ¶¶ 28-29; ECF 54-10 at 2 (Email from Juarez declining to interview plaintiff).

---

[29] The identity of the EA official who declined to interview Rodgers for positions with the Groundbreaker contract is not immediately apparent.  The evidence establishes only that Sager wrote to Rodgers and stated that the "EA Staffing Mgr" told Sager that "it doesn't appear that the hiring manager is interested in reaching out to you about those positions."  ECF 54-20 at 4-5.  Further, Bryant could not recall who made the decision not to interview Rodgers for these roles. *See* ECF 53-6 (Bryant Dep.) at 38 (Tr. at 144).  Neither party offers clarity on the issue.

As mentioned, Miller, Bryant, and Juarez stated that they did not have actual knowledge of Rodgers's protected conduct at the time any adverse decision was rendered.  Rather, Juarez and Bryant learned of Rodgers's EEOC charge on November 15, 2016.  ECF 53-9 (Bryant Decl.), ⁋ 17; ECF 53-10 (Juarez Decl.), ⁋ 31.  And, Miller testified that she did not learn of Rodgers's protected conduct until January 2021.  *See* ECF 53-11 (Miller Dep.) at 19-20 (Tr. at 50-51).  The Court has not been presented with any evidence that controverts those assertions, nor any evidence pertaining to the time at which any other EA employee who played a role in declining to interview plaintiff learned of the discrimination charge.  Thus, at bottom, plaintiff has failed to present evidence showing that a relevant decisionmaker had actual knowledge of her protected conduct at the time plaintiff suffered an adverse action.

Nor is there is any indication that any decisionmaker was even aware of plaintiff's *intention* to bring an EEOC charge for sex discrimination.  Rather, in her sworn declaration, Rodgers stated that she only told Sager, a COSMO employee, of her intention to file a complaint of sex discrimination.  ECF 54-12 (Rodgers Decl.), ⁋ 16.  To be sure, Rodgers suggested in her deposition testimony that "word got back to . . . some [EA] employees . . . that [she was] suing."  ECF 54-7 at 34 (Tr. at 211).  But, putting aside the fact that the testimony does not clarify at what time these employees learned of Rodgers's intention to file a complaint for sex discrimination, Rodgers did not offer any testimony to establish that "word got back" to any relevant decisionmakers in this case.  *Id.*

Plaintiff also urges the Court to consider evidence that, at first glance, might show the EA Defendants harbored retaliatory intent.  ECF 54 at 27; *see Roberts*, 998 F.3d at 123 (explaining that a plaintiff may establish the third element of a prima facie case for retaliation by showing "the existence of facts that 'suggest[ ] that the adverse action occurred because of the protected

activity.'") (quoting *Johnson*, 839 F. App'x at 783-84).  In particular, plaintiff asks the Court to consider her sworn statement that "Ms. Goodman told her that Defendants did not want her on the ESOC contract because she 'made complaints.'" ECF 54 at 27 (quoting ECF 54-12, ⁋ 17).  Further, plaintiff points out that she testified that Goodman also told her: "'They are aware of who you are.  They canceled the interview.  They don't want you returning back.'"  ECF 54 at 27 (quoting ECF 54-7 (Rodgers Dep.) at 36 (Tr. at 244)).

As a threshold issue, the statements are arguably hearsay.[30]  Rodgers has no personal knowledge of the facts underlying Goodman's assertion.  And, to the extent that evidence amounts to inadmissible hearsay, it "cannot create a factual dispute" for purposes of summary judgment. *Stanton v. Elliot*, 25 F.4th 227, 237 n.7 (4th Cir. 2022) (citing *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991)); *see also Graves v. Lioi*, 930 F.3d 307, 326 n.15 (4th Cir. 2019) (observing that "'hearsay, like other evidence inadmissible at trial, is ordinarily an inadequate basis for summary judgment'") (citation omitted)); *Evans*, 80 F.3d at 962.

Evidence this bare is not sufficient to create a genuine dispute of material fact in order to defeat a motion for summary judgment.  *CTB, Inc.*, 954 F.3d at 658 (explaining that "a party's 'self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment.'") (quoting *Williams*, 370 F.3d at 433) (alteration in *Williams*).[31]

---

[30] Goodman is a COSMO official.  *See* ECF 54-3 (Sager Dep.) at 21 (Tr. at 29).  Plaintiff's recitation of Goodman's assertions concerning the reason EA declined to interview plaintiff appears to constitute hearsay.  *See Greene v. Scott*, 637 F. App'x 749, 752 (4th Cir. 2016) (per curiam) (addressing the scope of the definition of a nonhearsay statement by a party opponent); *Sutton v. Roth, LLC*, 361 F. App'x 543, 547-48 (4th Cir. 2010) (same).  In any case, the parties' briefing does not address the point.

[31] The Court is mindful that the EEOC previously determined that there was reasonable cause to believe that the EA Defendants retaliated against plaintiff for filing a charge of discrimination.  ECF 54-25 at 4-5.  However, its written findings did not indicate that any relevant decisionmaker had actual knowledge of Rodgers's protected conduct.  *See id.*  And, ultimately, a

Accordingly, in the face of sworn statements of Bryant, Juarez, and Miller that they were unaware of plaintiff's EEOC charge until after plaintiff suffered an adverse employment action, Rodgers's mere speculation to the contrary is not sufficient to proceed on a Title VII claim for retaliation. Thus, the EA Defendants are entitled to summary judgment as to Count 2.

### IV.    Conclusion

In light of the foregoing, I shall grant the Motion in part and deny it in part. I shall deny the Motion as to Count 1, but grant the Motion as to Count 2.

An Order follows, consistent with this Memorandum Opinion.

Date: February 22, 2022                              _____/s/_____
                                                     Ellen L. Hollander
                                                     United States District Judge

---

determination from the EEOC does not "override the requirement that a plaintiff [establish] a *prima facie* case" of retaliation to survive a motion for summary judgment. *Brandford v. Shannon-Baum Signs, Inc.*, RDB-11-836, 2012 WL 3542604, at *4 (D. Md. Aug. 15, 2012), *aff'd*, 519 F. App'x 817 (4th Cir. 2013) (per curiam) (italics in *Brandford*); *see EEOC v. Harvey Walner & Assoc.*, 91 F.3d 963, 968 n.3 (7th Cir. 1996) ("This determination of reasonable cause is only an administrative prerequisite to a court action and has no legally binding significance in subsequent litigation.") (citing *EEOC v. J.M. Huber Corp.*, 927 F.2d 1322, 1331 (5th Cir. 1991)); *Georator Corp. v. EEOC.*, 592 F.2d 765, 769 (4th Cir. 1979) (finding that EEOC determinations carry "only as much weight as the trial court ascribes to [them]") (citations omitted); *Olson v. Largo-Springhill Ltd. P'ship*, 919 F. Supp. 847, 851-52 (D. Md. 1995) (explaining that, within the context of a suit brought under 42 U.S.C. §§ 1981, 1982, "'civil litigation at the district court level clearly takes on the character of a trial de novo, completely separate from [administrative actions]'") (alteration in *Olson*) (quoting *Smith*, 454 F.2d at 157).